MODERN WOODMEN OF AMERICA V. MARY KOZAK.

FILED DECEMBER 4, 1901. No. 10,534.

Commissioner's opinion, Department No. 1.

1. **Conflicting Evidence:** PREPONDERANCE. The verdict of a jury in a case properly submitted to them, when based on conflicting evidence, will not be disturbed merely on the ground that the apparent preponderance of the evidence is in favor of the losing party.

2. **Insurance Policy:** PROOF OF LOSS: ADMISSION AGAINST INTEREST. In an action on an insurance policy, proofs of loss made to the company by the beneficiary are admissible in evidence, subject

to explanation or correction, to the extent that they contain admissions against interest.

3. **Weight of Admission Question for Jury.** The weight to be given such admissions is a question for the jury, to be determined by a consideration of all the facts and circumstances showing or tending to show a knowledge of their contents or otherwise.

4. **Evidence:** VERDICT. Evidence examined, and *held* that verdict of the jury is supported by sufficient competent evidence.

ERROR from the district court for Gage county. Tried below before LETTON, J. *Affirmed.*

*George A. Murphy, J. G. Johnson* and *Talbot & Allen,* for plaintiff in error:

The statements made in the death proofs are admissions of the beneficiary. *New York Central Ins. Co. v. Watson,* 23 Mich., 485.

The rule that the proofs are not evidence in favor of the insured, does not preclude them from operating as admissions. *New York Central Ins. Co. v. Watson, supra; Campbell v. Charter Oak Fire & Marine Ins. Co.,* 10 Allen [Mass.], 213.

We do not mean to say that the party may not correct a mistake of fact in his original statement, but such a correction is not to be made known to the insurer, for the first time, on action to recover. *Campbell v. Charter Oak Fire & Marine Ins. Co., supra.*

The theory of murder suggested in the court below, is too improbable and too fanciful to be treated seriously. For the sake of argument, let it be assumed that some evilly disposed person had meditated the murder of young Kozak, and was successful in his unholy design. It was very considerate in the murderer to give ample notice to his unfortunate victim, so that he could arrange his personal affairs in a businesslike manner, causing his relatives and administrator the least possible trouble. It was clever in him to disappear so suddenly from the scene of his villainy, when his mission was performed. He was so careful in his movements as to arouse no suspicion, to leave

no clue to his identity, no motive for his act. He will probably never be discovered, unless the spirit of the murdered man, like the ghost in Hamlet, returns to earth to disclose the identity of the murderer. It may be possible that this is one of those instances that have been heretofore confined to the realm of fiction, where, by the exercise of some occult, hypnotic influence, one mind has successfully dominated another, so that the person under the magic influence acts solely from suggestions made by the superior mental force. If Kozak was murdered, the facts in this case would furnish a basis for a sensational narrative that would make Du Maurier, the author of Trilby, feel that the realism of fact had overshadowed the idealism of fancy or fiction. Under this branch of the argument we refer to *Rens v. Northwestern Mutual Relief Ass'n,* 100 Wis., 266, 75 N. W. Rep., 991.

The bullet was not positively identified by any witness as the one extracted from the brain of the suicide.

*Samuel Rinaker, Robert S. Bibb* and *Alfred Hazlett, contra:*

The presumption of the law is against suicide. *Travellers' Ins. Co. v. McConkey,* 127 U. S., 661.

The facts were for the jury.

Argued orally by *Murphy,* for plaintiff in error; by *Bibb, contra.*

KIRKPATRICK, C.

This action was brought in the district court of Gage county by defendant in error against plaintiff in error to recover upon a policy of life insurance or benefit certificate issued by plaintiff in error upon the life of John Kozak, in which certificate defendant in error was named as beneficiary. The petition set out a copy of the policy and alleged the death of insured, and full compliance with all the conditions and requirements of the contract on the part of insured and his beneficiary to be performed. The an-

swer admitted the execution of the benefit certificate; that deceased had made payments of all premiums and assessments due; that he was dead; that proofs of loss had been made. The answer further pleaded that the policy contained a condition that if the member should die by his own hands, whether sane or insane, the certificate should be null and void; that the insured, John Kozak, came to his death by his own hands, by shooting himself in the head; and denied any liability on the part of plaintiff in error. A reply was filed, denying all new matter contained in the answer. Trial was had to a jury, which resulted in a verdict and judgment for defendant in error, to reverse which the cause is brought here upon error.

The only controverted issue on the trial was whether John Kozak committed suicide. A number of assignments are made in the motion for a new trial and in the petition in error, but only two are argued in brief of counsel, and the remainder will not be considered. It is contended: First, that the court erred in refusing to instruct the jury to bring in a verdict for plaintiff in error, because there was not sufficient evidence to submit the case; second, that the verdict is not sustained by sufficient evidence. This reduces the controversy to the single question whether or not the verdict is sustained by sufficient competent evidence. The facts in the case are that about 11 o'clock in the evening of August 12, 1896, the insured was found dead in a burning straw stack on his farm near the town of Virginia. His body was pulled out of the stack, his clothes found to be burned off, and his face and body more or less burned. There was a bullet wound in the left side of his head, above and just a little back of the ear. The bullet was found lodged in his brain, and it is apparent from the facts that death was instantaneous. The next morning a thirty-eight calibre revolver, the wooden parts destroyed by fire, was found in the ashes of the straw pile, together with a part of a box of thirty-eight calibre cartridges. Some of the cartridges were exploded, evidently by the heat of the fire,

and some were not. Empty cartridges were in all the chambers of the revolver, three of which bore evidence of having been indented by the hammer of the revolver, the others having probably been discharged by the heat of the fire. Kozak's coat and vest, containing a watch and $11 or $12 in money, were found, together with a pitchfork, at some little distance from the stack. When his body was drawn from the stack by a neighbor a number of the cartridges exploded. Aside from the above facts, very little is known or disclosed by the evidence. The testimony discloses that a hardware merchant, whose place of business does not appear from the record, some time prior to the date of the death had sold a revolver of the same make as that found, with a box of cartridges, and that he described the purchaser as an intelligent young man of about twenty-four years of age. He said if the young man was of foreign extraction, there was nothing in his speech to indicate it. He did not know Kozak, and gave no further description of the man who purchased the revolver. The deceased was about twenty-five years of age; was born in Bohemia. His mother and sister were unable to speak English. A description of the deceased was not given to the jury, and it is not disclosed whether he could talk English fluently or not.

A short time prior to his death he paid a small bill owing to a blacksmith, and took a receipt. He collected several small amounts owing to him, and, when asked at one time whether he was going away, he said he did not know; that he might go to the old country; that this country was too slow for him. He was a member of the band at Virginia, and attended the band practice at that village the evening before his death. The members of the band called as witnesses all testify that they noticed nothing unusual regarding his behavior, as he seemed to be in his usual good spirits, his actions being perfectly natural and consistent with his actions at other times. The leader of the band testified that he noticed nothing unusual at the time of rehearsal, but after hearing of his death he got to

thinking the matter over, and concluded that Kozak's actions were somewhat different from usual on that evening. At band practice deceased was asked if he would go with the band to Crab Orchard to attend a political rally. He said he would if he was there; that is, at Virginia. Earlier in the week one of the band members asked him if he would go with the band to the rally, and he replied that he did not know; that he was going up to Beatrice, and was "coming back and raise h——." Whether or not he went to Beatrice is not disclosed. It was shown by the testimony of the register of deeds that there was recorded in his office a deed for John Kozak's farm, made by him to his brother, on August 8, 1896, four days before his death. The deed provided that his brother, Charles Kozak, was to pay off the mortgage on the farm, and to pay John Kozak's mother $50 yearly during her lifetime for her maintenance, and to pay his sister, Anna Kozak, $100 on May 1, 1898, and to Stella Kozak $400 May 1, 1898. No other testimony concerning this deed was offered to show whether Charles Kozak had made this kind of a contract of purchase with his brother. None of the members of the Kozak family were asked regarding the matter, the only evidence regarding the transaction being the record of the deed. None of the matters hereinbefore mentioned are of any evidential value or possess any probative force on the theory of suicide. They are all equally consistent with the theory of murder, suicide or accidental shooting; and for that reason, standing alone, as they do, in the record, they could not in any manner have assisted the jury in determining how Kozak came to his death.

We now come to an examination of the only material evidence in the case. About 9 o'clock of the evening of August 12th the deceased stopped at the home of Anna Hupka, who resided about a mile from his home. It seems that he had been keeping company with this young woman for several years. His visit lasted about an hour, during which she says his behavior was natural, and he seemed to be in his usual good spirits. However, during the time he

was there, he made some remarks about trouble he had had with his mother, claiming that she did not treat him just right, and that if she had treated him better it would not be necessary for him to go away so much. Before he left, about 10 o'clock, he gave her an unsealed letter, together with his photograph; the letter as translated reading as follows:

"Virginia, Nebraska. [It is without date.] "Dear Anna, Accept my last regards. If I have ever done any wrong to you forgive me. Don't think I had a bad opinion of you. I was willing to live like every well behaved man. I thought I would be happy but things turned out in a different way. You will hear of a curious end of my life. I would go away, but I can not do it, for you may say I made it on purpose. Only death can help me out of all. Good-bye, forget me, ingrate. I will banish myself for everything. What a pity on my young life." The letter was signed "John Kozak," and contained a postscript as follows: "Farewell, my home, farewell, all around my home. Dust and ashes all will be of me. One thought delights me, it is that you have been my best friend. I have been like the ocean wave, tossed from place to place until it disappears. Now I will be contempted by all for my frivolous deed."

After his departure, as soon as she had read this letter, she seems to have started with her sister to inform deceased's mother, or to have him watched, or something of that nature; her intention not clearly appearing from the testimony. It appears that while she and her sister were going to the Kozak farm, they were met by their brother, Joe Hupka, who got into the buggy with them and together they drove to the Kozak place. Hupka went into the house, but finding no one there, and seeing the stack on fire in the field, went to it and discovered the burning body, as already stated. There can be no doubt that the letter strongly indicates a purpose on the part of deceased in some manner to do violence to himself. But it is practically the only material evidence tending to support the suicide theory.

Plaintiff in error introduced a thirty-eight calibre revolver found in the stack, and also identified and offered in evidence the bullet which at the post-mortem examination was taken from the head of deceased. Defendant in error called two witnesses who were hardware merchants, who had dealt in firearms for many years, one of whom was a gunsmith, who, upon examination of the bullet in evidence, positively testified that it was a thirty-two calibre, and that it could not have been fired from the revolver in evidence. An examination of the bullet in question, which with the revolver is an exhibit in the case, shows that the testimony of the two witnesses must be correct. The bullet is clearly of a smaller calibre than the revolver and empty cartridges in evidence. Whether it is a thirty-two calibre is not so certain. There is no testimony in the record showing that Kozak had a revolver. No person saw him with it, and we have then, this situation: The revolver and the thirty-eight calibre cartridges, together with the bullet, are offered in evidence by plaintiff in error tending to support the theory of suicide; on the other hand, the evidence of two qualified witnesses and the bullet itself, that it could not have been fired from the revolver. This evidence regarding the size of the bullet, which is practically undisputed, could well have raised a serious doubt in the minds of the jurors, whether, if the revolver found was really that of Kozak, he came to his death by shooting himself. This evidence alone would seem to be sufficient to take the case out of the rule that, where from the evidence reasonable men can draw but one conclusion, the case resolves itself into one of law for the court. *Shiverick v. Gunning Co.,* 58 Nebr., 29; *Knapp v. Jones,* 50 Nebr., 490. That the bullet found in the head of deceased was too small to be fired from the weapon found in the stack was certainly a circumstance not easily reconciled with the theory that he had shot himself, and a doubt as to the truth thus created by the proof can be resolved only by the verdict of the jury. But there is another fact of which the jury could not have been ignorant, namely, the absence

from the record of all evidence tending to show a motive inciting to self destruction. Self-murder is abhorrent to the mind, and common observation teaches that normal men are not driven to the desperation of suicide without some exciting cause of more than ordinary magnitude. Kozak is shown by the record to have been healthful and prosperous, and the record contains no hint to furnish a motive for seeking his own end. In view of this fact, and in the absence of some uncontradicted evidence from which no other conclusion than that of suicide could be drawn by reasonable men, it is impossible to say that the verdict of the jury is clearly and unmistakably wrong. The letter to Anna Hupka, while it may be very convincing evidence that John Kozak intended to commit violence upon himself, is by no means conclusive evidence that he carried out such intention. The rule is that, when the evidence is uncontradicted, and reasonable men can draw different conclusions therefrom, it is proper to submit it to the jury. *A. & N. R. Co. v. Bailey*, 11 Nebr., 332, 337; *City of Lincoln v. Gillilan*, 18 Nebr., 114. Whether this letter, together with other facts in evidence, proved that Kozak committed suicide, was a question for the determination of the jury. The question here is not whether the verdict follows the preponderance of the evidence. Upon the question of the preponderance of the evidence this court is ordinarily powerless to disturb the jury's verdict. As said in the case of *Home Fire Ins. Co. v. Kuhlman*, 58 Nebr., 488: "A judgment based upon a verdict which is supported by sufficient competent evidence will not be disturbed on the ground that the apparent preponderance of the evidence is on the side of the losing party." Deceased may have been murdered, he may have committed suicide or he may have accidentally killed himself. This was a question for the jury to determine from all the evidence in the case, and their verdict being based upon conflicting evidence, it will not be disturbed. *Morton v. Harvey*, 57 Nebr., 304.

The rule as adhered to in this court is announced as follows in the case of *Sonnenschein v. Bartels*, 37 Nebr., 592:

"When a jury has decided a question of fact properly submitted, and the trial judge has overruled a motion for a new trial, then, if the record discloses competent evidence on which the finding may have been based, such finding can not be disturbed by the supreme court." *Young v. Roberts,* 17 Nebr., 426, 428; *Ross v. Langworthy,* 13 Nebr., 492, 495.

Plaintiff in error, to support its theory, offered in evidence the proofs of loss made by the officer of the lodge and sundry witnesses, and signed and presented by defendant in error in support of the claim in the amount alleged to be due upon the certificate. From these various documents it appears that the cause of death was represented as resulting from a pistol shot in the left temple inflicted by deceased's own hand. It is claimed that defendant in error is estopped by this showing from claiming that Kozak did not die by his own hands. This contention can not be sustained. Proofs of loss of this character, in so far as they are admissions against the interest of the party making them, are manifestly admissible, and, if unexplained, no doubt are entitled to great weight. But they are not conclusive of the fact. *Leman v. Manhattan Life Ins. Co.,* 46 La. Ann., 1189, 15 So. Rep., 388. The testimony in this case shows that Mrs. Kozak, defendant in error, was a Bohemian woman, unable to speak, read or write the English language. The officer of the lodge and the notary public, who prepared the proofs, say that her son was with her, and that they read the proofs to him, he in turn speaking to her in her native language, supposedly explaining the contents of the papers she afterwards signed. Whether he fully explained the contents of the papers to his mother or not, does not appear from the record. He was called as a witness, but was not interrogated regarding the matter. In Mrs. Kozak's examination she testified positively that she had no knowledge of the matters contained in the proofs of loss, and that she was informed that if she signed the papers she would get the money in thirty days, and, relying upon these represen-

tations, she signed them. She denied that the papers were read or explained to her. It was incumbent upon plaintiff in error to show past doubt that Mrs. Kozak clearly understood the import and effect of the papers she was signing. *Selden v. Myers,* 61 U. S., 506, 15 L. Ed., 976. If she signed them in ignorance of their contents, they would not constitute admissions against interest; and whether she signed them in ignorance of what they contained was a question for the jury, and, in view of the evidence on this branch of the case, it seems they were justified in disregarding them. The weight to be given such admissions is a question for the jury. *Paxton v. State,* 59 Nebr., 460, 463. Under the pleadings in this case, the burden was upon plaintiff in error to prove its affirmative defense by a preponderance of the evidence. That the presumption is against suicide in cases of this character, and that the insurer has the burden of proving self-destruction, is recognized by all the authorities. *Travellers' Ins. Co. v. Mc-Conkey,* 127 U. S., 661; *Whitlatch v. Fidelity & Casualty Co.,* 24 N. Y. S., 537; *Travelers' Ins. Co. v. Nitterhouse,* 38 N. E. Rep. [Ind.], 1110; *Mutual Life Ins. Co. v. Simpson,* 28 S. W. Rep. [Tex.], 837; *Inghram v.National Union,* 72 N. W. Rep. [Ia.], 559; *Burnham v. Interstate Casualty Co.,* 75 N. W. Rep. [Mich.], 445; and other cases which might be cited. And it would seem that the presumption is not overcome by proof that death resulted from the shot of a pistol found near the person of deceased. In the case of *Leman v. Manhattan Life Ins. Co.,* 46 La. Ann., 1189, it is said: "In such action, when the defense is self-destruction, the burden of proof is on the insurer to establish the suicide, and when circumstantial evidence only is relied on, the defense fails, unless the circumstances exclude with reasonable certainty any hypothesis of death by accident or by the act of another." *Travelers' Ins. Co. v. Nitterhouse, supra; Jones v. United States Mutual Accident Ass'n,* 61 N. W. Rep. [Ia.], 485. In the last cited case it is said: "Where in an action on an accident policy, it appears that the insured was killed by a pistol shot, the bur-

den is on the insurer to show that the shot was not accidental."

From what has been said, and from the authorities cited, it follows that the verdict and judgment are right, and it is therefore recommended that the judgment of the district court be affirmed.

HASTINGS and DAY, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

NOTE.—Where the policy contains no suicidal clause, and there is no statute governing such a case, but the insured, before entering into the contract, secretly and deliberately formed the purpose of taking his own life, the contract is thereby vitiated. The insurer does not sell the insured an option on his own life. The questions of suicide and insanity are for the jury. *Ritter v. Mutual Life Ins. Co.*, 169 U. S., 139.

THE LOCATION OF THE SUICIDAL WOUND is a matter of a great deal of importance. It is, of course, unlikely that the back would be found to be the site chosen, while writers upon medical jurisprudence generally admit that the suicide very rarely inflicts a wound upon the left side of the body. Self-inflicted injuries are usually upon the front of the body. Allan McLane Hamilton, Medical Jurisprudence, p. 278. —REPORTER.