SOVEREIGN CAMP OF THE WOODMEN OF THE WORLD V.
VACLAV HRUBY ET AL.

FILED OCTOBER 7, 1903.   No. 12,441.

1. **Review: VERDICT: EVIDENCE.** The finding of a jury will be set aside
   when there is not sufficient evidence to support it, as where the
   clear weight of testimony is against the verdict, so that it is
   apparent that it is wrong.

2. **Question of Law.** Frequently, the necessary inference from an
   undisputed state of facts is so certain that it is ruled upon as a
   question of law.

3. **Verdict.** A verdict of a jury whose finding is based upon con-
   jecture and not on the evidence, can not be permitted to stand.

4. ——: **EVIDENCE.** Record examined, and the verdict of the jury
   *held* to be unsupported by and against the evidence.

ERROR to the district court for Cuming county: GUY T.
GRAVES, JUDGE. *Reversed.*

*H. C. Brome* and *A. H. Burnett,* for plaintiff in error.

*Frank Dolezal* and *Clark C. McNish, contra.*

HOLCOMB, J.

An action was begun in the court below by the plaintiffs,
defendants in error here, for the recovery of the amount
named in a beneficiary certificate issued by the plaintiff in
error corporation, defendant below, on the life of Joseph
Hruby, shortly prior thereto deceased. The beneficiary
certificate sued upon contained the following provision:

"If the member holding this certificate should die by his
own hand or act, whether sane or insane, this certificate
shall be null and void and of no effect, and all moneys
which shall have been paid and all rights and benefits
which may have accrued on account of this certificate shall
be absolutely forfeited without notice or service."

In the answer of the defendant association, among other
things, it was alleged that the said Joseph Hruby did die
by his own hand, whereby, by the terms of said beneficiary

certificate, the same became and was absolutely null and void and the plaintiffs could acquire no rights thereunder. The reply denied the affirmative matter contained in the answer. The cause was tried and submitted to a jury on the issue thus raised, which returned a verdict for the plaintiffs for the amount prayed for in their petition. A motion was filed asking for a new trial on the ground that the court should have directed, as requested, a verdict for the defendant, and because the verdict returned by the jury was not supported nor sustained by the evidence. The motion being overruled, judgment was entered on the verdict and the defendant prosecutes error, relying principally on the ruling of the court on the motion for a new trial on the two different grounds mentioned to secure a reversal of the judgment. It may here be said that the deceased Joseph Hruby came to his death from a pistol shot, the weapon being held in his own hand; and the question for consideration is narrowed to the proposition, solely, as to whether his death was accidental or the result of an intentional taking of his life. It is earnestly insisted on the part of the defendant that, under the evidence, the court should have directed a verdict in its favor, and that the verdict returned is not sustained by and is contrary to the evidence. The decisive question to be determined, and the one to which we are disposed to confine and limit our inquiry and examination of the record is with reference to the sufficiency of the evidence to sustain the verdict. Joseph Hruby was a man thirty years of age, who had resided with his parents on a farm in Cuming county for a number of years, until shortly prior to his death. He was unmarried, apparently in good health in both body and mind, and, with the one exception which will hereafter be noted, it is difficult to glean from a careful examination of the record any reason for the taking of his own life. The beneficiary named in the certificate sued on was one Mary Vlach, who, it appears, had taken her own life just prior to the death of the insured. His next of kin were his father and mother who are plaintiffs in this action. The plaintiffs and most

of the witnesses were, when classed as to their nationality, Bohemians, and some points in the testimony, having possibly a material bearing on the issues, are left in some uncertainty, attributable no doubt to the witnesses' inability to understand and speak the English language perfectly. In the certificate and the application for it, it was represented that Mary Vlach was a cousin of the insured. From the testimony taken it appears that she was not thus related, although her mother and the father of Joseph Hruby, deceased, thus speak of the relationship of the two, but they can give no intelligent explanation of the kinship thus said to exist. It appears that the families of the Hrubys and the Vlachs were intimate from their early days, and it may be probable that their ancestors were in some way related. It appears, however, that there was a very warm attachment existing between the deceased and Mary Vlach, more nearly resembling that of the marriage engagement than of near relationship, although it is denied by the parents that any such engagement existed. For some months just prior to his death, Joseph Hruby had found employment in South Omaha, where he was working. Mary Vlach, it appears, was almost, if not quite, an invalid, and had suffered two surgical operations for her ailment. A third one, it seems, was regarded as necessary, rather than undergo which she took her life. Joseph Hruby was informed by telegraph of her death, but not of the cause, and immediately went from South Omaha to the home of her parents in Cuming county, where her remains lay. He arrived at the home of the parents about 11 o'clock in the forenoon, and remained in the room, where the body of the deceased girl lay, almost continuously until time for the afternoon meal, when, while he was alone in the room, a pistol shot was heard, and he was found immediately after in a dying condition, with a revolver in his hand, one chamber of which had been emptied. Mrs. Vlach, the mother of the deceased girl, testifies that after he came he cried a "good deal" and paced up and down the room, and that during the afternoon he was walk-.

ing back and forth in the room where the body lay. The mother and Hruby remained in the room, conversed together more or less until she left him to prepare the evening meal. He was, at first, under the impression that the girl's death was from natural causes. When she informed him of the true cause of her daughter's death and showed him the self-inflicted wound producing it, he was greatly shocked and grieved, and expressed much surprise that she should thus end her life. Mrs. Vlach was the last to see him before his death, and the first person who saw him after the shot was fired which terminated his life. She had left him but a few minutes before for the purpose of preparing his supper. She testifies:

Q. Where was Joseph Hruby the last time you saw him alive?

A. He was sitting on my bed joining that of my daughter.

Q. Was that the same room the body of your daughter was in?

A. Same room.

Q. And that was in that bedroom in the north end of the house?

A. Northeast corner.

Q. What was he doing the last time you saw him?

A. Last I saw of him he was in the kitchen, he was walking up and down, I went into the pantry and I then volunteered to make the supper for him. Well, I was preparing supper, I heard an alarm, and heard a report of some kind, and I ran into the room, and found Hruby standing up by the bed, and reeled around and fell face down toward the bed, right next to the body of the deceased girl.

Q. Did he have anything in his hand?

A. He had a revolver.

Q. In what hand?

A. In the right hand.

Q. Was he standing up when you went into the room?

A. That is before he reeled, he made a turn, and then fell down, and held the revolver in his right hand.

Q. Where were you when you heard the revolver shot?

A. In the kitchen.

Q. Who else was in the kitchen?

A. I was in the kitchen, alone.

Q. Where was Mrs. Joseph Vlach, Jr.?

A. She was in the kitchen.

Q. Where was Miss Barta?

A. In the kitchen.

Q. Who else was there?

A. No one else.

Q. Where was your son Joseph Vlach?

A. My son was on the premises.

Q. Well, whereabouts on the premises?

A. Well, now, he was in the yard.

Q. What was the next thing that was done after you saw him fall?

A. Why, I knelt down, and tried to remonstrate with him, why he had done the deed, and he simply rolled up his eyes, and quite a large amount of blood ran from him, and he died instantly afterwards.

Another witness, a doctor who was called after the death of Hruby had occurred, found him where he lay after he had fallen to the floor, the revolver lying by the body with one chamber discharged, a bullet-hole where the bullet had entered the right temple an inch and a half above and slightly forward from the lobe of the right ear, and his scalp powder burned at the point where the bullet entered. No other evidence is in the record more directly to the point as to the cause of death than which we have quoted, nor is there any conflict or contradiction. All of the other testimony buttresses and supports the essential features just referred to. If any reason is disclosed for the intentional taking of his own life by the deceased, Hruby, and it seems there must be one to account for his self-destruction, if such be the case, it must, we think, be found in the very strong attachment existing toward the deceased, Mary Vlach, and his grief and affliction because of her tragic end. That there was a most intense affection ex-

isting between them is clearly disclosed by the whole
record and, more especially, by a letter written to her by
him while in South Omaha a short time before her death,
which can not well be disregarded in this connection. He
addresses her in the fondest and most endearing terms;
tells her how he is progressing in his new work, and of his
plans and prospects for the future. He speaks of having
obtained a number of shares in a gold mining company
that he believes and asserts are very valuable; what his
yearly income would probably be, and asks if that is not
pretty good for "us two." He asks her to keep the informa-
tion to herself, and offers to transfer his certificates of
stock to her name and have it sent to her, charging her for
the second time to say nothing about the matter but to
keep it between them. It is quite evident, from a perusal
of the missive, that the same reasons which caused him to
take out the policy of insurance in her favor prompted the
offer to turn over to her, and for her benefit, what he be-
lieved to be a valuable property; and that all of his
thoughts and actions were with reference to what he might
be able to do that would contribute to the happiness of
her and himself. If they were not affianced in name, the
letter spoken of and his actions furnish the strongest
possible evidence that they were drawn together by ties
equally as strong, and that the relationship existed in
fact, if not in name. With a record of this character, and
with evidence pointing so strongly to intentional self-
destruction, and with circumstances and environments
conducing to such act, judging human nature as expe-
rience and observation has shown it to be, can it be said
that the finding of the jury, which is tantamount to a
declaration that death was the result of an accident, is
supported by sufficient, or by any competent evidence?
Can a verdict, which can be accounted for, only, on the
theory that it is reached by a line of reasoning extending
into the domain of conjecture and speculation, be upheld
in the face of a record pointing so unmistakably to but
one inference as to the cause of death? Is there, and can

there be, any rational hypothesis, deducible from the record, justifying the inference that the death of the insured was the result of an accident? The problem thus presented, as is often the case, is a delicate and difficult one for the reviewing court to solve. A jury, doubtless, of sensible and honest men has, by its findings, said that the insured did not intentionally take his own life or, correlatively speaking, that his death was the result of an accident. We are thus called upon to examine the record and say whether there is evidence sufficient to support the finding of the jury; to say whether there is a genuine controverted question of fact to be determined by the jury, or whether the ultimate fact to be determined is so indisputably established as to resolve the controversy into questions of law only. If from the evidence as to the ultimate fact to be determined—that is, the cause of the death of the deceased—it may be said, when such evidence is weighed and considered according to the legal rules which must always be applied, that the inference that death was the result of an accident has competent substantial evidence for its support, or that the evidence does not establish to a reasonable certainty that the mortal wound was intentionally self-inflicted, then, the findings can not, as we interpret the law, be rightfully disturbed. If, on the other hand, but one rational inference can be drawn as to the ultimate fact or facts which are to be deduced from the undisputed evidence, and that is the inference of the intentional taking by the deceased of his own life, then, the verdict can not be upheld because not supported by any competent evidence. It is the settled rule, in this court, that the finding of a jury will be set aside when there is not sufficient evidence to support it, as where the clear weight of testimony is against the verdict, so that it is apparent that it is wrong. *Anheuser-Busch Brewing Ass'n v. Murray*, 47 Neb. 627; *Fisk v. State*, 9 Neb. 62; *Mathews v. State*, 19 Neb. 330; *Brown v. Smith*, 26 Neb. 376; *State Bank v. Smith*, 29 Neb. 434; *Conway v. St. Joseph Iron Co.*, 33 Neb. 454; *Woodriver Bank v. Dodge*, 36 Neb. 708.

There is no substantial conflict in the evidence in the case at bar. All of the evidential facts are practically undisputed. How the insured came to his death is the ultimate fact which is to be determined from the undis-puted facts thus appearing in the record. It is often the case that the necessary inference from an undisputed state of facts is so certain that it may well be, and is, ruled upon as a question of law. The authorities are all agreed on this proposition. The difficulty lies in the application of the rule. If under the evidence the death of the insured may be attributed to either an accident or to suicide, the law would presume that it was the former, and not the latter. *Burnham v. Interstate Casualty Co.,* 117 Mich. 142. The principle underlying the rule results from the experience of humanity, which teaches us that the love of life is usually strong in the minds of all and is, ordinarily, sufficient to deter a person from self-de-struction. Whether, however, the cause of death is the result of an accident, or of intentional acts, is an inference which must be reasonably deducible from the evidence, and can not rest upon mere conjecture or speculation. A verdict of a jury whose finding is based upon conjecture, and not on the evidence, can not be permitted to stand. *Leisenberg v. State,* 60 Neb. 628. It is argued in brief of defendant in error and suggested as a theory, that the death of the insured may properly be inferred, from the evidence, to be the result of an accident, as found by the jury. It is said that he carried a revolver in his hip pocket; that he was tired from traveling and, in lying down to rest, found it inconvenient to have it remain in his pocket, and that in removing it, by some inexplicable means, he accidently discharged it, with fatal results. There is an utter lack of evidence that the deceased had lain down. The evidence is conclusive that the only im-print on the bed in the room where the body of the deceased girl lay, was that of a person sitting on it, other-wise it was, as expressed by the witnesses, "made up." The mother testifies that Hruby sat on the bed during the

afternoon, while talking with her. The bed was about three feet from the improvised bier where the remains of the girl lay. Hruby was standing between the two, and near to the body of the girl, when he was discovered by the mother after the shot was fired, in a standing position and reeling as he fell to the floor. When he fell, he lay alongside of the bier, on his back, with his head toward the feet of the dead body. That is, he must have been standing near the head of the bier, and fell toward the foot of it. There is a total lack of evidence indicating a removal of the weapon from his pocket for any ordinary purpose, or tending to warrant the inference that he was handling it for other reasons than to use it as an instrument of self-destruction. No circumstance can be pointed out, consistent with a use of the weapon for some explainable purpose, from which accidental shooting probably resulted. To indulge in such an inference is to engage in fanciful conjecture and spectral speculation. The basis of such a conclusion is not to be found in the evidence but altogether outside of it. It is to guess, to surmise, to conjure and to conjecture. While the burden of proof is on the defendant to establish its defense of alleged suicide by a preponderance of the evidence, as is required in all civil actions, it is not required to, by its evidence, demonstrate to a mathematical certainty that the deceased intentionally took his own life. This is asking more than the law demands. It is quite true as is argued by counsel, that the deceased was in good health, in the prime of life, dutiful to his parents, with pleasant surroundings and bright prospects for the future. We think it clear, however, from an examination of the record, that, notwithstanding all these, there is but one rational explanation for the act, and that the evidence pointing to suicide overcomes all that may properly be inferred from these conceded facts. It is within the range of human possibilities that his death was accidental, but it is not at all probable, nor is there, in our judgment, evidence in the record from which it may properly be inferred. Hruby

was at the time manifestly greatly grieved; he was suffering keenly because of the tragic death of one to whom he was most warmly attached and who occupied a place in his affections second to none other. His future and hers he regarded as being linked together by indissoluble ties. He was advised, immediately, of her death, and went at once to where her remains lay. He was under the impression that she had died from natural causes until sometime during the afternoon, when he was informed by the girl's mother as to the cause of her death, and shown the self-inflicted wound producing it. This could not have been other than a great shock to his already perturbed state of mind. He was alone only for a few moments, while the mother of the girl went into an adjoining room to prepare the evening meal. He carried a revolver in his hip pocket. He was in the room wherein lay the body of the deceased, Mary Vlach. A pistol shot was heard, and the mother of the girl rushed to the room. She found Hruby, while yet in a standing position, by the side of the dead body, reeling as if about to fall, with a smoking pistol in his right hand, and a mortal wound in his right temple. He fell to the floor, and was asked why he did the deed, but, without replying or uttering a word, soon expired. As to the cause of his death, under such circumstances, there can, in our view of the record, be but one rational answer given:

"The jury could not have said, as men, that the circumstances did not show suicide so as to leave no reasonable probability to the contrary; therefore it was not permissible for them to say it, as jurors, and have that stand as a verity in the case. The court should have granted the motion to direct the verdict, and, failing in that, should have set the verdict aside and granted a new trial." *Agen v. Metropolitan Life Ins. Co.*, 105 Wis. 217.

"There was no evidence whatever to indicate * * * that his death was accidental. The only rational or, indeed, conceivable explanation is that the deceased had committed suicide; any other conclusion would outrage

all reason.  Had the jury found otherwise, its findings would have been set aside as being against evidence." *Sovereign Camp of the Woodmen of the World v. Thiebaud,* 69 Pac. (Kan.) 348.

Our attention is also called to another alleged error relating to an instruction given by the court to the jury, which in view of the conclusion already reached will not now be considered.  For the errors complained of and discussed herein, the judgment of the trial court is reversed and the cause remanded.

REVERSED.