ELIZABETH HARDINGER, GUARDIAN, v. MODERN BROTHER-HOOD OF AMERICA.*

FILED DECEMBER 21, 1904.   No. 13,604.

1. **Insurance:** BENEFIT CERTIFICATE: DEFENSE OF SUICIDE: BURDEN OF PROOF. In an action upon a municipal benefit certificate, where the defense interposed is suicide, the burden is upon the defendant to establish such fact by a preponderance of the evidence.

2. **Cause of Death:** QUESTION FOR JURY. The question of the proximate cause of death in such an action is ordinarily a question of fact for the jury, and should not be taken from its determination unless the evidence is of such a nature as to clearly and certainly point to but one reasonable conclusion.

3. **Case Distinguished.** *Sovereign Camp of the Woodmen of the World v. Hruby*, 70 Neb. 5, examined and distinguished.

4. **Circumstantial Evidence.** When circumstantial evidence only is relied on to establish suicide, the defense fails unless the circumstances exclude with reasonable certainty any hypothesis of death by accident or by the act of another. *Modern Woodmen of America v. Kozak*, 63 Neb. 146, followed and approved.

5. **Cause of Death:** QUESTION FOR JURY. *Held*, That, under the facts and circumstances proved in this case, reasonable minds might differ as to whether deceased came to his death from a wound inflicted by his own hand with suicidal intent, and that such question should have been submitted to the jury under proper instructions.

ERROR to the district court for Dawson county: CHARLES L. GUTTERSON, JUDGE. *Reversed.*

*Warrington & Stewart* and *H. M. Sinclair,* for plaintiff in error.

*J. E. Markley, George C. Gillan* and *J. J. Sullivan,* contra.

OLDHAM, C.

The Modern Brotherhood of America, defendant in error in this case, is a fraternal beneficiary association doing business in this state. It issued a membership certificate to one George S. Hardinger upon his joining a lodge of this association at Overton, in Dawson county, Nebraska, on May 3, 1899, which provided, in substance, that in case of the death of said member while in good standing in the lodge the beneficiary therein named shall participate in the mortuary fund of said association to an amount not exceeding $3,000 within 90 days after proof of such death. This certificate also contained the following proviso: "If the holder of this certificate shall die by his own hand, whether sane or insane, then this certificate shall be null and void and of no effect, and all moneys which shall have been paid and all rights and benefits which may have accrued on account of this certificate shall be absolutely forfeited." Plaintiff in this action is the wife of George S. Hardinger and the guardian of the beneficiary named in the certificate.

On the 5th day of April, 1902, Hardinger was found on Wooded Island, in Jackson Park, in the city of Chicago, Illinois, dead or dying from a pistol shot wound in his head. Payment of benefits was refused by the association, and this action was brought in the district court for Dawson county by the guardian of the beneficiary to enforce payment thereof. The association for its defense alleged suicide. On the trial, when all the evidence had been taken, the trial court directed a verdict for the defendant. This was done upon the theory that there was but one reasonable conclusion to be drawn from the evidence, and that was that Hardinger took his own life. Judgment was rendered upon this verdict, from which error is prosecuted to this court by plaintiff.

The only assignment of error necessary to review is that the court erred in directing a verdict under the testimony. A careful review of the evidence contained in the bill of

exceptions shows that Wooded Island, the place of the tragedy, is located in Jackson Park, in the city of Chicago, and is one of the public parks in that city. This island is surrounded by a lagoon of water, and is a long narrow strip of land, containing about 20 acres. It is widest at the south end, and gradually tapers to a very narrow point at the north end of the island. There are two bridges, one at the north and one at the south end of the island, over which foot passengers enter. There is a fringe of willows and shrubbery about 25 yards in width around the shore of the entire tract. This shrubbery is quite dense in most places. The island is patrolled by park policemen, two of whom were on the island at the time the shot was fired that resulted in Hardinger's death. These police officers are the only witnesses that testified concerning the facts and circumstances surrounding the tragedy. Maher, one of these officers, who had been on the island from one o'clock in the afternoon until the time of Hardinger's death, which occurred at 7:10 P. M., testified as follows:

Q. Do you remember the occurrence of finding a man there dead that evening?

A. Yes.

Q. State what you first observed.

A. I was about 200 yards away. I heard the shot, and then officer Brown was coming along, and we thought it was somebody shooting at ducks in the lagoon at the time. Officer Brown said, "There is somebody shooting ducks on the lagoon." He went through the shrubbery and I went in the edge of the shrubbery, and there was an old log laid in the shrubbery, and we saw Hardinger's body lying alongside of the log. Brown was in the edge of the shrubbery at the time and I was right close to him, about a couple of yards.

Q. Go on and describe now just what you observed as to the position of the body.

A. He had evidently been sitting on this log, and he had a revolver at his right-hand side, and the bullet lodged

in the left eye. He was not quite dead at the time, so officer Brown stayed with him, and I went over to the Wooded Island police station, and they came with the wagon.

This witness further testified that the revolver along by the side of deceased had three empty chambers in it and three chambers with cartridges, one of which appeared to have been recently discharged. He also said that Hardinger was unconscious when they came to him; never spoke, and only lived a few minutes after their arrival. He further described the wound, saying the bullet had entered through the right temple near the right eye and penetrated to the left eye, where in his judgment it had lodged. He also testified that they could not see Hardinger from where they were standing when the shot was fired, even if he had been standing up, because there was an elevation or a kind of a hill between them and the place of the shooting. He also said deceased's hat was lying on the west side of the log and his body on the east side. The testimony of officer Brown was the same in all essential points as that of officer Maher, differing solely in his estimate of the distance between the deceased and the officers at the time the shot was fired, and also stating that the hat of deceased was on the log or the stump of the log by which he was lying, when found. This slight variance tends to throw no light on any material circumstances surrounding the death. When officer Maher notified the authorities, an ambulance wagon was sent to the island, and the body of deceased was taken to the morgue, where it was identified by his widow, plaintiff in this action, and turned over to her for burial. On Hardinger's body the officers found, among other things, a memorandum book giving his name and place of residence, the number of his watch, and the size of his hat, and containing the following entry: "There is nothing to tell, simply weary." This memorandum book was offered in evidence, and has the appearance of a book that had been carried for some time by the deceased. The entries in

this book are conceded to have been in the handwriting
of the deceased. There is nothing to indicate that any of
the entries had been newly made, and there is no evidence
that deceased had a pencil about him when found, al-
though these entries were made with a lead pencil and are
dim from apparent wear. As tending to show a probable
motive for suicide, it was proved that Hardinger was
formerly the cashier of a bank at Overton, Nebraska, and
that he was short in his accounts, and had for this reason
been dismissed from his position as cashier. This oc-
curred nearly three years before his death, and there is no
evidence that he was ever prosecuted or threatened with
prosecution on account of his defalcation. There was also
evidence introduced tending to show that Hardinger was
overcome by escaping gas while alone at his home in June,
1901, and that for sometime thereafter he was quite sick
and somewhat mentally deranged; that at one time shortly
after the accident he disappeared from his home, and was
gone from Monday until Tuesday night, and that when
he returned he informed his wife that he was looking for
his child which had been stolen; that as a matter of fact
his child was at home all the time, and the idea of its
having been stolen was a delusion. As against this evi-
dence tending to show temporary insanity and delusions,
the plaintiff, wife of deceased, testified that he had entirely
recovered from the effect of his partial asphyxiation, and
was in his normal condition, both of mind and body, for
five or six months before his death; that their domestic
life was peaceful and happy, that they resided in a suburb
of Chicago called Englewood; that on the morning of his
death, Hardinger left at his ordinary time intending to go
to the city and return, as was his custom, at 5 o'clock for
his dinner. This was the last time that anyone appears
to have seen him until he was found by the policemen in
a dying condition in the park.

This is all the material testimony in the record tending
to throw light on the facts and circumstances surround-
ing Hardinger's death, and the question now arises, could

reasonable minds, in the light of this testimony, draw different conclusions as to whether the shot that ended Hardinger's life was fired with his own hand and with suicidal intent, or whether it might have been accidentally fired by him or someone else, or whether it might have been intentionally fired by someone else? If but one reasonable conclusion can be drawn, and that, that the shot was fired by deceased with suicidal intent, then the learned trial court was right in directing a verdict; but if the inferences either of an accidental shot by deceased or anyone else, or of an intentional shooting by someone else, can reasonably arise from this evidence, then the question as to whether the defense of suicide had been established by a preponderance of evidence should have been submitted to the jury for its determination under proper instructions. We think that the deductions that must follow from the testimony are that Hardinger came to his death from a gunshot wound, and that the shot was fired from the revolver that was found by the officers at his right hand. We think it is clear enough that the shot was fired from this revolver, because but one shot was fired, and the empty cartridge in this revolver appearing to have been recently discharged shows to a fair degree of certainty that the shot came from it. But whose revolver was this? Nobody who testified seems to know. There was no effort made to show that Hardinger owned a revolver or that he ever carried one, nor is there a scintilla of evidence in the record that before this occurrence he had ever threatened to commit suicide. Nobody saw him come on the island, although officer Maher had been there on his beat for six hours. Nobody seems to know whether he came alone or whether he came in the company of others. When his body was discovered it was getting dark, and the policemen made no effort to search the island to find whether anyone else was on there at that time. From the sight of the dying man and the revolver lying near at hand, the officers jumped at the conclusion that it was a case of suicide, and made no effort to investi-

gate any other theory which might have accounted for the death. There is no evidence even that the wound was powder-burned, as would have been likely had it been inflicted by deceased's own hand. While from this testimony we can readily see how a reasonable mind might infer that the death was self-inflicted and with suicidal intent, yet on the other hand we think it would not be an unwarranted and unreasonable conclusion from all the facts and circumstances in evidence that this wound might have been received at the hands of another, either through accident or intention. When the shot was fired the officers who were north of the deceased could not have seen him even if he had been standing erect, as Maher testified, because of an elevation or "kind of hill" between them. Now, if they could not have seen Hardinger, they could not have seen someone else standing near him, and if someone did stand near him and shoot him, either intentionally or accidentally, such person could have dropped the revolver where it was found, skirted the underbrush down to the south bridge of the island, and have escaped in the growing darkness without observation. While the memorandum in the book found on his person, and the incident of his partial asphyxiation by gas, might each tend to suggest the probability of suicide, yet neither nor both of these incidents conclusively show a suicidal intent, and the business failure of the deceased is so remote from the occurrence as to throw little light upon it.

It is urged by counsel for defendant in error that this case falls clearly within the rule recently announced by this court in *Sovereign Camp of the Woodmen of the World v. Hruby*, 70 Neb. 5. In this case it was held that the facts and circumstances surrounding the death of Hruby so clearly and unmistakably pointed to suicide that no other reasonable conclusion could be drawn from them, and therefore that, as a question of law, the court should have directed a verdict in favor of the defendant. In our judgment there is a well defined difference between the facts and circumstancs surrounding Hruby's death and

those surrounding the death in the case at bar. In the
*Hruby* case.the evidence shows that he was strongly at-
tached, either by ties of kindred and long association or
by the more tender ties that bind the different sexes to-
gether, to a young lady, Mary Vlach, who was the bene-
ficiary named in his certificate; that while working in
South Omaha he received a telegram announcing the
sudden death of Mary Vlach; that on receipt of this mes-
sage he came to the home of the deceased in Cuming
county; that when informed of the death of the young
lady he was greatly depressed in spirit, and that his de-
pression continued or increased when informed that she
had died by her own hand. While the mother of the de-
ceased young lady was preparing a meal for Hruby and
the members of the family, he went into a bedroom and
sat down on a bed adjoining the one on which the young
lady's body was lying. After this he was seen by the
mother walking the floor in the kitchen adjoining this
room. In a few minutes the mother heard a shot, ran into
the room, and saw Hruby standing in front of the dead
girl with a revolver in his right hand and a bullet wound
in his head; he turned partially around, reeled and fell
face downward, and expired almost instantly. In this
case, as said by HOLCOMB, J., "the question for considera-
tion was narrowed to the proposition, solely, as to whether
the death was accidental or the result of an intentional
taking of his own life." In other words, it was clearly
and unmistakably proved that Hruby came to his death
from a pistol-shot wound fired by his own hand, for there
was no one else in the room alive to fire the shot. So that
the only alternatives were either accidental or intentional
shooting by the deceased, and the conduct of the deceased
and the circumstances surrounding the occurrence so
plainly indicated suicide that it was held that no other
reasonable inference could be drawn. Now in the case at
bar there is no evidence that clearly and unmistakably
shows that Hardinger shot himself, nor do all the facts
and circumstances relied upon to show a suicidal intent

point to this motive with such unerring certainty as to exclude every other reasonable hypothesis. In *Modern Woodmen Accident Ass'n v. Shryock,* 54 Neb. 250, this court said:

"In our opinion the question of what is the proximate cause of death in an action like that now under consideration, is a question of fact to be determined by the jury from a consideration of the evidence and the determination of this question should not be withdrawn from the jury unless, from an admitted state of facts, all reasonable men fairly exercising their judgments must draw the same conclusion."

The legal presumption is always against suicide, and consequently the burden of proving self-destruction is upon the party pleading it. *Modern Woodmen of America v. Kozak,* 63 Neb. 146; *Travelers Ins. Co. v. McConkey,* 127 U. S. 661; *Schultz v. Insurance Co.,* 40 Ohio St. 217.

In *Modern Woodmen of America v. Kozak, supra,* it was said by this court:

"In the case of *Leman v. Manhattan Life Ins. Co.,* 46 La. Ann. 1189, it is said: 'In such action, when the defense is self-destruction, the burden of proof is on the insurer to establish the suicide, and when circumstantial evidence only is relied on, the defense fails, unless the circumstances exclude with reasonable certainty any hypothesis of death by accident or by the act of another.' *Travelers Ins. Co. v. Nitterhouse,* 11 Ind. App. 155; *Jones v. United States Mutual Accident Ass'n,* 92 Ia. 652. In the last cited case it is said: 'Where, in an action on an accident policy, it appears that the insured was killed by a pistol shot, the burden is on the insurer to show that the shot was not accidental.'"

We think that under the facts proved in this case reasonable minds might draw different conclusions as to whether the death of Hardinger was self-inflicted with suicidal intent or whether it resulted from other causes.

We therefore recommend that the judgment of the dis-

Hardinger v. Modern Brotherhood of America.

trict court be reversed and the cause remanded for further proceedings in conformity with this opinion.

AMES and LETTON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the cause remanded for further proceedings in conformity with this opinion.

REVERSED.

The following opinion on rehearing was filed April 5, 1905. *Judgment of reversal vacated. Judgment of district court affirmed:*

1. Insurance: ACTION ON CERTIFICATE: BURDEN OF PROOF. In an action on a beneficiary certificate, or a life insurance policy, where the company or association alleges suicide as a defense, the burden of proof is on the defendant to establish that fact by a preponderance of the evidence.

2. Presumption: EVIDENCE. The presumption in such a case that a sane person will not destroy his own life is a rebuttable one and must yield to proof of physical facts clearly inconsistent with it.

3. ———: ———. Competent proof of facts and circumstances surrounding and connected with the death of the assured which point clearly and unmistakably to the conclusion that he took his own life, and which exclude all reasonable probability of death by murder or accident, is sufficient to overcome and destroy the presumption above mentioned, and establish, at least *prima facie*, the defense of suicide.

4. Directing Verdict. If nothing is shown by either party inconsistent with the proof of such facts, it is the duty of the trial court to direct the jury to return a verdict for the defendant. *Sovereign Camp of the Woodmen of the World v. Hruby*, 70 Neb. 5, followed.

BARNES, J.

This case is before us a second time for our consideration. In an opinion, *ante*, p. 860, written by Mr. Commissioner OLDHAM, and approved by the court, it was held that the trial court erred in directing a verdict for the defendant below. A rehearing was allowed, the case has

been reargued, and the same question is again presented for our consideration. Our former opinion contains a full and complete statement of the pleadings, from which it appears that the defense of suicide was the only issue tendered for trial in the court below. On that question the burden of proof was on the defendant. *Modern Woodmen of America v. Kozak*, 63 Neb. 146; *Travelers Ins. Co. v. McConkey*, 127 U. S. 661, 8 Sup. Ct. Rep. 1360, 32 L. ed. 308; *Schultz v. Insurance Co.*, 40 Ohio St. 217, 48 Am. Rep. 676. Examining the record, in view of this rule, we find that it discloses that one George S. Hardinger joined the association on the 8th day of April, 1899, and that at a later date a beneficiary certificate was issued to him in favor of his minor son; that he was found dead, or in a dying condition, on Wooded Island, in Jackson Park, in the city of Chicago, on the evening of April 5, 1902. On the trial in the district court it was shown by the association, in support of its defense, that the deceased was in charge of a bank in Overton, Nebraska, from 1895 to 1899; that early in the latter year he became a defaulter for something like $30,000, and was discharged from his position for that reason; that he never made his shortage good, but was not prosecuted criminally, nor was he unduly pressed for the payment of his shortage, because of his relationship to the owners of the bank; that later on in that year he moved to Chicago, rented rooms in a flat at number 6,448 Armour Avenue, in Englewood, a suburb of that city, and established his residence there; that after he lost his position with the bank he was despondent and troubled about his business matters; that in June, 1901, while his wife was visiting her parents at Tinley Park, about 25 miles from Chicago, and while he was alone in his house, he was overcome by escaping gas. He was found by the postman, who called a physician, and he was resuscitated. He was ill from the effects of his asphyxiation for a considerable time; was treated by one Dr. Lovewell, and it appears he recovered from that illness in about six weeks. When asked by the doctor on one oc-

casion as to how the matter occurred, he refused to make any explanation of it; that when the same question was asked him by his wife, he informed her he did not know anything about it.   From that time until his death it appears that he was ill at times; that in August, 1901, he was troubled with hallucinations; and believed that his child had been taken away.   He thereupon left home in search of it, being gone about two days.   It was also shown that it was his habit to go to the city every morning to amuse himself, and remain there until time for the evening meal; that he was without employment, but had, in a great measure, recovered his physical health at the time of his death.   His condition can best be explained by quoting the evidence of his wife:

Q. After he was sick in June he never went to work again as bookkeeper, did he?

A. He did not.

Q. And after he was sick in June he was confined to the house for some time, wasn't he?

A. A few days.

Q. And he was under the care of the doctor for some time, was he not?

A. In June?

Q. Yes, and until along in October, he was still doctoring with Dr. Lovewell, wasn't he?

A. I don't know; I don't remember.

Q. And in August he was under the delusion that his son was stolen?

A. At that time, yes.

Q. And from that time on did he go down town every day?

A. He was in the house about a week until he was well again, and he went down town every day.

Q. That was after he was wandering around?

A. Yes.

Q. Then he would go down town?

A. Yes.

Q. Do you know what he went down for?

A. Just went down for pastime.

Q. Went down for pastime?

A. That's what he said.

Q. Now you say after that time in August, when he was away a day and a half, after he got well he was all right mentally. Do you mean that?

A. He was all right, but he was sick.

Q. Well mentally?

A. Well, I think he was at times.

Q. You think he was at times?

A. Most of the time.

Q. A part of the time he was mentally unbalanced?

A. Well, I wouldn't call it unbalanced.

Q. Under depression?

A. Well, he was dizzy.

Q. And along toward evening he would have fits of melancholia, or depression?

A. No, he was the same all the time, but suffered from insomnia; couldn't sleep.

It further appears that on the morning of April 5, 1902, Hardinger left his house and went to the city as usual; that at about seven o'clock that evening two policemen, who were on duty on what is called Wooded Island, in Jackson Park, heard a shot fired at the distance of from 100 to 200 yards from them, and hurried immediately to the place from whence the sound came to ascertain its cause. They found Hardinger lying on his back by the side of a log; his blood and brain oozing from a wound inflicted by a pistol shot on the right temple at the edge of the hair line in front of the ear; the wound was blackened around its edge where the bullet entered; a revolver lay at his right hand with three cartridges in its chamber, one of which had been recently discharged, and the smell of powder smoke still lingered about the place. A careful examination disclosed no footprints or traces of the presence of any other human being near the body, or in that immediate vicinity; his clothing was undisturbed; his watch, ring, purse and other effects were found on

his person, and in his vest pocket was a memorandum book in which his name and address were written. This memorandum book had written in pencil with his own hand upon the first leaf or page, lengthwise thereof, the words: "There is nothing to tell; simply weary." The book contained no other writing of any kind, and Hardinger died without regaining consciousness. The testimony also showed that no other person was present on that part of the island; that if there had been any other person in that vicinity the officers could have seen him.

With the foregoing facts established by the evidence the district court, on the motion of the defendant association, directed the jury to return a verdict in its favor, and the only question for our consideration is, was such direction error? It may be stated at the outset that self-destruction is not to be presumed. In other words, the presumption arising from the general conduct of mankind is that a sane person will not destroy his own life. But this is a rebuttable presumption, and easily yields to physical facts clearly inconsistent with it. It is not proof, nor does it stand in the way of proof, and when sufficient evidence is introduced to overcome this legal presumption it disappears. On mature reflection we are of unanimous opinion that the proof in this case clearly overthrows the presumption above mentioned, and excludes all probability of death by accident or by the hand of another. The undisputed facts and circumstances in this case lead naturally and rationally to but one inference, and that is that George S. Hardinger shot himself intentionally. It seems to us that no other fair, just or reasonable conclusion is possible. When the facts naturally and reasonably lead the mind to but one conclusion, there must be something in the circumstances, something somewhere in the evidence, to suggest murder or accident. No circumstances can be pointed out consistent with the use of the weapon, for some unexplainable purpose, from which accidental shooting probably resulted. To indulge in such inference is to engage in fanciful conjecture. The basis of

such a conclusion is not to be found in the evidence, but
if it exists at all it is altogether outside of it, and is a
guess, a surmise or a conjecture. No fact or circumstance
can be pointed out in the evidence which indicates that the
use made of the revolver by Hardinger was accidental;
and there is nothing in the record from which a presump-
tion of death by murder can be justified. There is no con-
flict in the evidence. It all points unmistakably and
clearly to death by suicide. Any other conclusion would
outrage all reason. And had the question been left to the
jury, and had that body found otherwise, its finding
would have been set aside as against the evidence. A ver-
dict of the jury for the plaintiff in this case would have
had no basis except mere conjecture. In such a case it is
the duty of the court to treat the matter in question as one
of law, and direct the proper verdict. *Sovereign Camp of
the Woodmen of the World v. Hruby,* 70 Neb. 5.

The rule is well established that, if, from the undisputed
facts, different minds may not honestly reach different
conclusions without reasoning irrationally, it is not error
for the trial court to withdraw the case from the consider-
ation of the jury, and direct a verdict consistent with the
facts. *Knapp v. Jones,* 50 Neb. 490; *Shiverick v. Gun-
ning Co.,* 58 Neb. 29. In this case different minds cannot
arrive at different conclusions. The evidence points
clearly and unequivocally to suicide. In order to reach
any other conclusion one must go outside of the record and
resort to mere speculation or conjecture. Our former
opinion followed *Modern Woodmen of America v. Kozak,*
63 Neb. 146, which counsel for the plaintiff insist is in point
and authority for our present decision. An examination
of that case shows that nearly all the facts and circum-
stances tended strongly to prove that Kozak came to his
death by his own hand. It was shown, however, beyond
question, that the bullet which was taken from the wound
in Kozak's head, and which evidently caused his death, was
several sizes smaller than the caliber of the revolver which
was found near his body, and could not have been fired

from that weapon.  If such proof had been made in the case at bar, or if there was any competent evidence to dispute the testimony offered by the defendant in proof of its defense of suicide, an entirely different question would have been presented.  In such a case the court should submit the question of fact to the jury; while in the case at bar there was no dispute as to the facts, and the whole matter was properly treated as a question of law.

We are now of opinion that the district court did not err in directing the jury to return a verdict for the defendant, and, for that reason, our former judgment is vacated and the judgment of the district court is in all things

AFFIRMED.