Smith v. Royal Highlanders.

SARAH A. SMITH, APPELLEE, V. ROYAL HIGHLANDERS, APPELLANT.

FILED SEPTEMBER 26, 1914. No. 17,726.

1. **Trial: DIRECTED VERDICT.** In an action by the holder of a beneficiary certificate, if there is evidence sufficient to sustain a verdict for the plaintiff, the case should be submitted to the jury, and in such case a motion upon the part of the defendant for a directed verdict is properly overruled.

2. **Insurance: PROOF OF DEATH: ESTOPPEL.** Before the beneficiary should be held estopped from the assertion of her claim by any statement in the proofs of death, there should be evidence of the fact that she was identified with such proofs at the time they were made, and a voluntary statement of one of the officers of the association would

not be binding upon the beneficiary, unless she had knowledge of it or
directed it to be made.

3. Appeal: CONFLICTING EVIDENCE. Where there is a conflict of evidence
concerning the manner in which the assured came to his death, the
verdict of the jury will not be disturbed.

4. Trial: ARGUMENT OF COUNSEL: HARMLESS ERROR. Where counsel for
the plaintiff makes statements to the jury which are improper because
outside of the evidence in the case, or for other sufficient reasons,
there is ordinarily no prejudicial error, if the court at once sustains
the objection made by counsel for the defendant, and in effect warns
the jury against the consideration of the matter sought to be intro-
duced. *Atkins v. Gladwish,* 27 Neb. 841; *Catron v. State,* 52 Neb. 389.

APPEAL from the district court for Webster county:
ERNEST B. PERRY, JUDGE.  *Affirmed.*

*Hainer & Craft,* for appellant.

*Bernard McNeny, contra.*

HAMER, J.

The plaintiff, Sarah A. Smith, brought an action in the
district court for Webster county against the defendant,
the Royal Highlanders, upon a beneficiary certificate is-
sued by the defendant to Rufus B. Smith. The plaintiff
recovered a judgment against the defendant for $1,578.45.
It is claimed by the appellant that the certificate provided:
"In case of death occurring after becoming a member and
remaining in good standing for three years or over, the
sum of $3,000 will be paid to Sarah A. Smith, bearing the
relation of wife, upon satisfactory proof of death, together
with the surrender of this certificate.  *  *  *  Provided,
further, that in the case of suicide of the member, either
sane or insane, the amount of all contributions of the mem-
ber to the fidelity fund of the fraternity, only, shall be
paid to the beneficiary named in this certificate."

It is set up by way of defense that the certificate pro-
vided that there should be no recovery in case the holder
should commit suicide. It is strenuously contended that
Rufus B. Smith, the insured and the husband of the plain-
tiff, committed suicide, and therefore that the plaintiff is

entitled to recover nothing except the money paid in to the association, being $66. It is claimed that the proof shows that the said Rufus B. Smith died of carbolic acid poisoning at his home near Filley, "from drinking carbolic acid with suicidal intent."

It is the contention of Mrs. Smith, the plaintiff, that Mr. Smith did not commit suicide. There is a long correspondence between counsel touching the merits of the case, which we do not deem it necessary to consider, especially as it would prolong the opinion to an unusual length if we copied it or any considerable part of it. We will examine the evidence. The testimony for the plaintiff tends to show that the insured died on February 5, 1911, at his home near Filley, Nebraska. He had been at home all day, and about 7 o'clock in the evening took off his coat and shoes in the sitting room, where he had been conversing with the family. He said he was going to bed, and smiling he went out of the room. He had eaten that day. Apparently he was well.

An argument is made that a person could not take a quantity of carbolic acid without knowing the fact, and therefore it is claimed that it could not have been taken without the intent to commit suicide. At the close of the plaintiff's testimony the defendant moved the court as follows: "The defendant, upon the evidence, admissions and allegations of the pleadings in reference to the proofs of death, moves the court to instruct a verdict in favor of the defendant, for the reason that it appears thereby, and is not disputed, that the plaintiff has made and admitted certain proofs of death which are in evidence; that the plaintiff has never asked that the same be withdrawn, reformed, changed, or corrected, nor offered other or different proofs of death or the manner thereof; that the proofs in evidence are the only ones upon which the defendant society has had opportunity or been called upon to act; that no proofs of death have been submitted to the defendant making it *prima facie* liable, and no furnishing of proofs has been waived by the defendant; in this condi-

tion of the record the defendant cannot be liable for more than the $66 admitted in its answer." The motion was overruled, and the defendant excepted.

We think we should examine the evidence with a view to ascertaining whether there is evidence to sustain a verdict for the plaintiff. The defendant is a fraternal beneficiary order similar in character to the Workmen or Woodmen. It is said by the plaintiff that quite a competition has existed between the different fraternities; that the Workmen initiated the practice by which in case of the death of a member the *local lodge* is to take care of the *proofs of death*; that the other orders have followed this example and that quite a competition has existed between different fraternities; that the local lodges become the agents of the supreme lodge to procure new members; that it is of the greatest importance to demonstrate that losses are promptly paid and with the least possible delay or attention on the part of the beneficiaries who are assured by the officers of the local lodge that their interests will be looked after, and without *any action on their part*. In this case it seems that one J. F. Boggs was the local secretary and treasurer of the lodge at Filley, and he assured the son of the plaintiff that he would do the acts required to secure the insurance without any action on the part of the plaintiff.

We copy from the bill of exceptions: "Q. After your father's death, what, if anything, did you do about the sending in of proofs of death to the insurance company? A. Well, one day Mr. Boggs 'phoned over for me to come over. Q. Which Boggs? A. J. F. Boggs. And so I went over; and my mother said 'you had better go over,' and he said that he would fix up the death proof and send it in; he and the lodge would attend to that; that that *was his business,* and that *he would see to it,* and that we did not *have to worry or do anything about it,* and that was his business. Q. You say your mother told you to see Boggs? A. Yes, sir." Cross-examination by Mr. Hainer: "Q. You say that your mother told you to see about getting the

proofs in? A. I said that J. F. Boggs 'phoned over, and she said for me to go over and see what he wanted; and Mr. Boggs said he would see after the *death proofs,* and *he* and the *lodge would go and send it in.* Q. So that was the arrangement that was made with him? A. *He said he was the fellow to look after it.* * * * Q. You didn't take any further steps at all? A. No, sir; he said *she would get her money in a few days.* Q. I am asking about sending in the proofs, you know he was going to send in the proofs? A. He said he would. Q. You let it go at that? A. Yes, sir. * * * Q. And you informed your mother of what had passed between you and Mr. Boggs? A. What words were said I told her. Q. On both sides? A. Yes, sir."

The witness, the son of the plaintiff, testified that the carbolic acid had been on the shelf about two months; that he got it for a horse "to take the poisoning out of her foot." He was also asked if there was a medicine there on the shelf that was a dark medicine which he sometimes took for stomach trouble. He answered that there was; he also answered that there was only a little difference in the *color of that medicine* and the *carbolic acid.*

The letter of the chief secretary, F. J. Sharp, to the secretary-treasurer, J. F. Boggs, is dated March 23, 1911. It says: "Nowhere in the proofs is a detailed statement as to the cause of his death, and, as it is stated he died from *an overdose* of carbolic acid, we will have to know how he happened to take this poison."

March 25, 1911, J. F. Boggs, secretary-treasurer, wrote F. J. Sharp, secretary, at Aurora, that he had been unable to find any clippings from a newspaper. March 28, 1911, F. J. Sharp, chief secretary, wrote J. F. Boggs, secretary-treasurer at Filley, Neb. "Valiant Clansman: I am just in receipt of your favor of the 25th inst." April 17, 1911, J. F. Boggs, secretary-treasurer, wrote F. J. Sharp, chief secretary, saying: "Inclosed please find copy of Beatrice Express and Sun, each of which contains account of death of Clansman Rufus B. Smith. *There was no*

*coroner's inquest held on body of Rufus B. Smith."* The date of the Sun clipping is February 7, 1911. The date of the other is not given, except that a little letter concerning the matter is published in the other paper, dated February 6.

February 6, 1911, J. F. Boggs wrote a letter to "F. J. Sharp, Clansman, Aurora. Sir: This is to notify you of the death of Clansman R. B. Smith who passed away about 9 o'clock last night." February 15, 1911, J. F. Boggs, secretary, Dunkirk Castle, wrote F. J. Sharp, secretary, Aurora, asking for papers necessary for death proofs. February 25, 1911, F. J. Sharp wrote J. F. Boggs, saying that he inclosed "additional proof of death, which kindly get fully and properly executed." February 23, 1911, A. C. Tilton, illustrious protector, and J. F. Boggs, secretary-treasurer, sent in what is termed an official notice of the death of Rufus B. Smith. March 14, 1911, C. S. Boggs, appeared before the clerk of the district court and signed a certificate saying that the cause of the death was carbolic acid poisoning; that the deceased was sick about 45 minutes. There is also the statement of a friend, J. F. Boggs, made on the 21st of March. He says the cause of the death was carbolic acid poisoning. On the 21st of March, 1911, A. C. Tilton, illustrious protector, and J. F. Boggs, secretary-treasurer, make a statement which is designated proof of death. On the 27th of March, 1911, F. J. Sharp, chief secretary, makes a certificate to the effect that all payments were made, and that Rufus B. Smith was in good standing. On the 27th of June, 1911, the executive committee make a certificate that there is $66 due to Sarah A. Smith, upon surrender of the beneficiary certificate.

It will be noticed that the plaintiff does not sign any of these papers, that whatever is done is done by some officer of the lodge. She could not be bound without voluntary action upon her part. It does not affirmatively appear that it was necessary that she should see these papers. We think it may be safely assumed from all the

facts stated that Mr. Boggs, the secretary-treasurer of the
subordinate lodge, got these newspaper clippings and sent
them in without consulting the plaintiff, and with the
view of assisting the defendant to defeat the plaintiff's
claim. Both set up the death of the assured, and one pur-
ports to detail the particulars on the evening of the death
of the decedent. These clippings are not evidence, and we
know of no good reason why the plaintiff should be held
responsible for them or any effect which they might pro-
duce. They cannot be "proofs" in any event, and the
plaintiff is not shown to have been connected with them.
To hold that the plaintiff is in any way responsible for
them or bound by them would be unfair. Where the bene-
ficiary is by the evidence connected with the "proofs,"
then they may be admissions. In this case the plaintiff
is not identified with the newspaper clippings and such of
the proofs as were prepared by Mr. Boggs and others.

There is quite a similarity between the instant case and
the case of *Modern Woodmen of America v. Kozak*, 63 Neb.
146. In that case the plaintiff in error offered in evi-
dence the proofs of loss made by the officer of the lodge
and signed and presented by the defendant in error. The
contention was that death resulted from a pistol shot
inflicted by the deceased's own hand. It was claimed that
the defendant in error was estopped by reason of the show-
ing from claiming that Kozak did not die by his own
hands. This court held that the contention could not
be sustained. We copy from the opinion:

"Plaintiff in error, to support its theory, offered in evi-
dence the proofs of loss made by the officer of the lodge
and sundry witnesses, and signed and presented by de-
fendant in error in support of the claim in the amount
alleged to be due upon the certificate. From these various
documents it appears that the cause of death was repre-
sented as resulting from a pistol shot in the left temple
inflicted by deceased's own hand. It is claimed that de-
fendant in error is estopped by this showing from claim-
ing that Kozak did not die by his own hand. This con-

tention cannot be sustained. Proofs of loss of this char-
acter, in so far as they are admissions against the inter-
est of the party making them, are manifestly admissible,
and, if unexplained, no doubt are entitled to great weight.
But they are not conclusive of the fact. *Leman v. Man-
hattan Life Ins. Co.*, 46 La. Ann. 1189, 15 So. 388. The
testimony in this case shows that Mrs. Kozak, defendant
in error was a Bohemian woman, unable to speak, read or
write the English language. The officer of the lodge and
the notary public, who prepared the proofs, say that her
son was with her, and that they read the proofs to him,
he in turn speaking to her in her native language, sup-
posedly explaining the contents of the papers she after-
wards signed. Whether he fully explained the contents of
the papers to his mother or not does not appear from the
record. He was called as a witness, but was not interro-
gated regarding the matter. In Mrs. Kozak's examination
she testified positively that she had no knowledge of the
matters contained in the proofs of loss, and that she was
informed that if she signed the papers she would get the
money in 30 days, and, relying upon these representations,
she signed them. She denied that the papers were read
or explained to her. It was incumbent upon plaintiff in
error to show past doubt that Mrs. Kozak clearly under-
stood the import and effect of the papers she was signing.
*Selden v. Myers*, 61 U. S. 506. If she signed them in
ignorance of their contents, they would not constitute
admissions against interest; and whether she signed them
in ignorance of what they contained was a question for
the jury, and, in view of the evidence on this branch of the
case, it seems they were justified in disregarding them.
The weight to be given such admissions is a question for
the jury. *Paxton v. State*, 59 Neb. 460. Under the plead-
ings in this case, the burden was upon plaintiff in error
to prove its affirmative defense by a preponderance of the
evidence. That the presumption is against suicide in cases
of this character, and that the insurer has the burden of
proving self-destruction, is recognized by all the authori-
ties. *Travelers Ins. Co. v. McConkey*, 127 U. S. 661; *Whit-*

*latch v. Fidelity & Casualty Co.,* 24 N. Y. Supp. 537; *Travelers Ins. Co. v. Nitterhouse,* 11 Ind. App. 155; *Mutual Life Ins. Co. v. Simpson,* 28 S. W. (Tex. Civ. App.) 837; *Inghram v. National Union,* 103 Ia. 395; *Burnham v. Interstate Casualty Co.,* 117 Mich. 142. * * * The presumption is not overcome by proof that death resulted from the shot of a pistol found near the person of deceased. In the case of *Leman v. Manhattan Life Ins. Co.,* 46 La. Ann. 1189, it is said: 'In such action, when the defense is self-destruction, the burden of proof is on the insurer to establish the suicide, and when circumstantial evidence only is relied on, the defense fails, unless the circumstances exclude with reasonable certainty any hypothesis of death by accident or by the act of another.' *Travelers Ins. Co. v. Nitterhouse,* 11 Ind. App. 155; *Jones v. United States Mutual Accident Ass'n,* 92 Ia. 652. In the last cited case it is said: 'Where in an action on an accident policy, it appears that the insured was killed by a pistol shot, the burden is on the insurer to show that the shot was not accidental.' "

It is further said in *Modern Woodmen of America v. Kozak, supra:* "Upon the question of the preponderance of the evidence this court is ordinarily powerless to disturb the jury's verdict. As said in the case of *Home Fire Ins. Co. v. Kuhlman,* 58 Neb. 488: 'A judgment based upon a verdict which is supported by sufficient competent evidence will not be disturbed on the ground that the apparent preponderance of the evidence is on the side of the losing party.' Deceased may have been murdered, he may have committed suicide, or he may have accidentally killed himself. This was a question for the jury to determine from all the evidence in the case, and, their verdict being based upon conflicting evidence, it will not be disturbed. *Morton v. Harvey,* 57 Neb. 304."

No one may be quite certain whether the taking of the poison was with suicidal intent or due to an accident. There was a pantry door which opened from the kitchen into the pantry. In this pantry there was a shelf. It was over the cabinet and just handy to reach. This shelf was

behind the pantry door when the door was open, and it extended perhaps ten feet on the east side. On this shelf there were bottles scattered along, although the most of them were right behind the door on the east end of the shelf. These bottles contained "Dr. Pierce's Favorite Prescriptions," "Dr. Pierce's Golden Medical Discovery," "Watkin's Vegetable Anodyne Liniment," the bottle of carbolic acid, and two kinds of lemon extracts, and one of orange. There had been carbolic acid there before. They kept it for the hogs and chickens. There was a bottle of carbolic acid kept up there on that shelf. There would be a bottle put there every month. The plaintiff testified: "We kept it for the hogs. Sometimes I put it in the chickens' feed." There was nothing to prevent the deceased from first taking a drink of lemon extract or orange extract or Dr. Pierce's Golden Medical Discovery. The deceased may have accidentally taken a swallow of the carbolic acid supposing it to be one of the extracts, and then he may have attempted to relieve the burning sensation caused by the acid by drinking one of the extracts or one of Dr. Pierce's remedies. There is testimony of hearing some sort of violence. He may not have remained conscious longer than was necessary to reach the top of the stairs. He was probably suffering horribly, and perhaps was struggling to reach the bed when he fell upon it in convulsions. Because of the awful pain which he suffered he may have been unable to think.

It is urged by defendant that there is error in instruction No. 2, for the reason that it puts the burden of proof upon the defendant to affirmatively show that the insured committed suicide, and states that the legal presumption is that he did not commit suicide. That is the rule as we understand it.

The defendant quotes from the syllabus in *Hart v. Fraternal Alliance*, 108 Wis. 490, and *Insurance Co. v. Newton*, 22 Wall. (U. S.) 32. In the first of these cases the admissions were taken in connection with the testimony of the doctor as to the cause of death. It is said in the body of the opinion in *Insurance Co. v. Newton, supra*: "When

the plaintiff was permitted to show what the agent and offi-
cers of the company admitted the proofs established, it
was competent for the company to produce the proofs thus
referred to and use them as better evidence of what they
did establish.  *  *  *  The question being in all the cases
whether these proofs *estopped the insured from impeach-
ing the correctness of their statements, or from qualify-
ing them, or whether they were subject to be explained
and varied or contradicted on the trial.*"  The case quoted
from is directly in point because in the instant case there
is a failure to show that the proofs were prepared by the
plaintiff or that she was directly connected with them in
any way.  She could not be *estopped* except by something
which she did.

In *Insurance Co. v. Higginbotham,* 95 U. S. 380, there
was an application for the reinstatement on a policy of one
Dr. Day.  The application was made on October 1.  There
was a statement accompanying it of the condition of the
doctor's health.  The reinstatement was not made until Oc-
tober 14.  There was a question as to whether Dr. Day's
health was the same October 14 that it had been when the
application was made.  The following month he was un-
doubtedly in a decline.  He was obliged to give up his po-
sition as a teacher on the 18th of October.  For some time
prior to that he was somewhat debilitated.  In the No-
vember following he had consumption, from which he died
in January.  Touching this matter, the United States su-
preme court said:  "The jury might account for it on the
theory that the whole contract was intended to be and was
as of October 1, and that it spoke from that date.  There
is every indication that Day thus relied upon that con-
tract, nor is there any reason to believe that he intended
to deceive or to conceal.  *  *  *  He probably died in
the honest belief that he had thus provided for his widow.
It would be far from good faith to his representatives
should it now be held otherwise."

In *Mallory v. Travelers Ins. Co.,* 47 N. Y. 52, it was held:
"Where, from the facts of the case, it appears that a vio-
lent death was either the result of accidental injuries or

of a suicidal act of deceased, the presumption of law is against the latter." In that case it is said in the body of the opinion: "The policy was one embracing cases only where the death was caused by an injury received from an accident. From the facts above it appeared either that the death was caused by such an injury or the suicidal act of the deceased; but the presumption is against the latter. It is contrary to the general conduct of mankind; it shows gross moral turpitude in a sane person." The deceased was known to have used a bridge across a stream where the waters of the sound set into the land and extended up the stream at high tide. The manner of his death was uncertain. There was a wound upon his head, and there was a break in the corresponding part of his hat. The court said: "Although this wound might have been made after the deceased was in the water, or while falling in, yet it was for the jury to say how it was caused, and to determine its effect upon the question whether the death was the result of an accidental injury, or whether the deceased had destroyed his own life." There was an effort to avoid the policy upon the theory that the deceased 20 years before he made the application had a severe fever, during which he was more or less insane, but after recovering therefrom he was sane until 3 or 4 years before he made application for the policy. He was placed in a retreat for insane persons, and was kept there about 3 months before being discharged. It was claimed by the defense that the deceased should have made a full statement of the facts to the company. He was himself a solicitor for the company. He had had a general conversation with the president in which the president told him, in answer to his statement that he could procure a great number of applications in Newark, that he must be cautious as the company did not wish to insure insane persons or persons who had had habits of intoxication. The New York supreme court said: "This general conversation with the president some time before the application had no tendency to show a fraudulent concealment of material facts

96 Neb. 51

upon making the application. There was no evidence tending to show that he was then insane, or that he had been for some time before, and this conversation did not convey to his mind the idea that the company regarded those that a long time before had been insane, as peculiarly liable to accidents." The proximate cause of death was for the jury. *Travelers Ins. Co. v. Melick*, 65 Fed. 178; *Cochran v. Mutual Life Ins. Co.*, 79 Fed. 46; *Moon v. Order of United Commercial Travelers, ante*, p. 65.

It is claimed by the defendant that there was misconduct of counsel for the plaintiff. It seems that Mr. McNeny characterized Mr. Sharp as "the most illustrious protector" of the defendant association. He said something about the color of his hair being visible to the jury. He also talked about one of the witnesses for the defendant, who seems to have admitted that he had been engaged in the patent right business. He referred to him as a patent right man or an ex-patent right man; that he had appeared at the trial without any subpoena, and that he testified that he was employed by the defendant at the rate of $10 a day to investigate the case. As one reads the record in this case he readily becomes aware of the fact that there was a strenuous fight when the record was made, and it is not at all clear that there was not as much art and as much aggressiveness on the side of the defense as on the other side. What Mr. McNeny said was of a humorous character. There was an opportunity to say it because of the high-sounding titles given to the officers of the company. If Mr. McNeny was humorous at the expense of the patent right man, he was only getting even, and there was provocation for it because Ringer had testified that the plaintiff told him that her dead husband had beaten her. The method followed by both sides is not to be commended. We are not ready to say that counsel for the plaintiff prejudiced the rights of the defendant by what he said and did. Counsel for defendant objected, and his objections were sustained.

In *Atkins v. Gladwish*, 27 Neb. 841, the counsel for the plaintiff used the following language: "No wonder that

those witnesses entertained feelings of hostility against defendant, the old bald-headed fiend, knowing, as they did, what he had done, and that one jury had found him guilty of the charge." To the use of this language defendant's attorney objected, and asked that the court restrain the attorney. Thereupon the court said to the attorney that such talk was improper, and told the jury not to consider it. The attorney desisted. Concerning the foregoing conduct of counsel this court said: "If upon the attention of the court being called to the above language of counsel in summing up to the jury it had refused to stop him and express its disapprobation of the language to the jury, such refusal would probably have been reversible error. But the court, having, on the contrary, stopped and reprimanded the counsel, did all that good practice required of it, and I do not think the misconduct of the attorney in the use of the language quoted was of that flagrant character which under the statute would vitiate a verdict *per se*."

In the instant case counsel for the plaintiff, Mr. McNeny, appears to have attempted to get before the jury his statement that the Royal Highlanders "hired a patent right man," a man who said he was engaged in the patent right business, to come to Red Cloud at $10 a day, and not only to help contest this claim and keep this woman from getting this money—here there was an objection which was promptly sustained. Then there was the statement "that they hired a patent right man to come here at $10 a day." There was an objection to that, which was promptly sustained. Then Mr. McNeny said: "But take this statement, then, that the patent right man; that the ex-patent right man admitted he got $10 a day to look this case up; he was not a detective; he was an investigator, according to his theory; and that the officer of his lodge, the most illustrious protector, my gray-haired friend there, and the counsel for the insurance company, allowed him, not only to try to beat this woman out of her money or give evidence against her, but allowed him to traduce the memory of the dead clansman; he said that she told him

Smith v. Royal Highlanders.

Mr. Smith had struck her." Mr. Hainer objected: "I object to all these statements as entirely out of order; it is not based on the testimony, and should not be allowed to go to the jury. By the court: So far as the last statement is concerned the objection is sustained." There was no other objection or exception. The record shows that the court promptly sustained the objection of counsel for the defendant. This discussion seems to have grown out of the testimony of one of the witnesses for the defense.

In *Catron v. State*, 52 Neb. 389, one of the counsel for the state said: "My friend has referred to the fact that these foreign witnesses have remained here—has asked why they still remain. I'll tell him. It is because we thought some of the jury was, or might be, fixed by the defense, and that the jury would therefore fail to agree, and if so we proposed to try this case again at once, and have kept these witnesses here for that purpose." Mr. Sullivan at once objected to Mr. Harrington's statement, and the objection was sustained; the court saying that the statement was improper. The conviction was sustained.

The defendant complains of instruction No. 5, given to the jury on the court's own motion. The contention made is that the instruction given was equivalent to telling the jury that the plaintiff was under no obligation to truly state the facts; and that her statements have no binding effect in the absence of personal knowledge. We are unable to see any error in the instruction given. What we have said touching the merits of the case disposes of the contention made.

We see no sufficient reason for reversing the judgment of the court below. It is right, and it is

AFFIRMED.

BARNES, ROSE and SEDGWICK, JJ., not sitting.