A. R. Brown v. S. P. Hows.*

(*Nashville*, December Term, 1930.)

Opinion filed July 18, 1931.

*As to indefiniteness and uncertainty of statute, see 25 R. C. L., 810, 987; R. C. L., Perm. Supp., p. 5613; R. C. L., Pocket Part, title "Statutes" section 62. As to repugnancy and inconsistency, see 25 R. C. L., 914 et seq.; R. C. L., Perm. Supp., p. 5623; Pocket Part, title "Statutes," section 167.

Ewing & Ewing and Cornelius, Wade & McKinney, for plaintiff in error.

Roberts & Roberts, John J. Hooker and Seth Walker, for defendant in error.

Mr. Chief Justice Green delivered the opinion of the Court.

This is an election contest over the office of justice of the peace from the Ninth Civil District of Davidson County. The county court decided in favor of Brown. The circuit court, on appeal, decided in favor of Hows, and Brown has brought the case to this court.

There were two magistrates to be elected from the aforesaid civil district in the election held on August 7, 1930. There were three candidates. According to the returns certified by the election officers, M. C. Hicks received 194 votes, A. R. Brown received 154 votes, and S. P. Hows received 153 votes. There is no contest over the election of Hicks. In the circuit court, the proof justifying that course, a recount of the ballots was directed and held under the supervision of the court. This recount disclosed that Brown and Hows had each received 155 votes. The circuit court deducted from the total vote received by each of these candidates certain votes which it was held were illegal and determined that Hows had re-

ceived 154 legal votes and Brown 152 legal votes. The court thereupon declared Hows to have been elected.

Since the argument of the case before us, counsel for Brown have made further investigation of the statutes covering contests of election for the office of justice of the peace and, in a brief, have advanced the contention that the action of the county court, which determined the contest in favor of Brown, was the action of a special tribunal and final. It is accordingly insisted that the proceedings in the circuit court were *coram non judice* and void. Counsel for Hows have replied, by brief, at some length to this argument.

It seems that counsel for both parties were somewhat uncertain as to whether this contest should have been instituted before the county court, consisting of the county judge, or whether it should have been instituted before the quarterly county court. It is said that while the hearing was actually had before the county judge, an order of the quarterly county court was entered ratifying the action of the county judge.

The doubt referred to and the claim now made as to the conclusiveness of the action of the county court arise by reason of the provisions of chapter 5 of the Acts of 1925.

Sections 895, 896, 897, 898 and 899 of the Code of 1858 (sections 1315, 1316, 1317, 1318 and 1319, Thompson's-Shannon's Code) set out the practice to be followed in respect to a contest over the election of justice of the peace. Chapter 5 of the Acts of 1925 is entitled "An Act entitled an Act to amend Sections 895, 896, 897, 898 and 899 of the Code of Tennessee, relating to contested elections of Justices-of-the-Peace (said Sections of the Code of Tennessee enacted in 1858, being compiled in Sections 1315, 1316, 1317, 1318 and 1319 of Shannon's Annotated Code of Tennessee)."

The Act of 1925 amends sections 895, 896, 898 and 899 in certain particulars not necessary to be noticed in this investigation.

Section 897 of the Code of 1858 read as follows:

"The County Court shall hear and decide the contest."

By the Act of 1925, section 897 is made to read:

"The County Court shall hear and decide the contest, provided that the Justice who has been declared the duly elected Justice-of-the-Peace by Election Commission, shall not have a vote in this Court of contest."

It is urged that the proviso in the amended section to the effect that the justice commissioned shall not have a vote in the court of contest shows that the contest was to be before the quarterly county court composed of justices of the county.

It will be observed that the language of section 897 of the Code is not changed by the amendatory Act, except by the addition of the proviso.

Prior to 1925, it had been settled by at least two decisions of this court that the *county court* mentioned in section 897 and section 888 of the Code (Thompson's-Shannon's, 1308) to which was committed jurisdiction of cases involving contested elections of justices of the peace, constables, county trustees, county registers, county court clerks and county surveyors or rangers, was the county court comprised of the county judge or county chairman and not the quarterly county court. *Johnson* v. *Brice,* 112 Tenn., 68; *Sheffy* v. *Mitchell,* 142 Tenn., 48.

So when the legislature in 1925 reenacted that the county court should have jurisdiction of election contests involving the office of justice of the peace, repeating the language of Code section 897, it must have referred to the county court comprised of the county judge or county chairman. The words of section 897 had been

judicially defined as referring to that tribunal and were so understood by the people and the profession. The proviso, therefore, was without meaning. No justices of the peace are included in the county court, the reference being to the county judge or chairman, and no justices would have a vote in such county court, whether they were parties to an election contest or otherwise.

■ It is well settled that a meaningless clause in a statute may be rejected. *Wright* v. *Cunningham,* 115 Tenn., 445; *Riggins* v. *Tyler,* 134 Tenn., 577.

As held by the Supreme Court of South Carolina, a proviso that has ''no sensible connection'' with the enacting part of the statute, will be disregarded as surplusage. *Gilliland* v. *Citadel Square Baptist Church,* 33 S. C., 164, 11 S. E., 684.

■ If the proviso be regarded as repugnant to the purview of this statute, if the purview commits jurisdiction to one court and the proviso to another court, still the proviso is ineffective. As pointed out in Ruling Case Law the modern rule is that a proviso or saving clause which is directly repugnant to the purview or body of the Act is inoperative and void for repugnancy. 25 R. C. L., 987, and cases cited. See also for a full review of the authorities *Penick* v. *High Shoals Mfg. Co.,* 113 Ga., 592, 38 S. E., 973.

Having concluded, therefore, that the Act of 1925 was not effective to change the jurisdiction of an election contest over the office of justice of the peace from the county court comprised of the county judge or county chairman to the quarterly county court, we find it unnecessary to discuss the other proposition of counsel for Brown that the judgment of the quarterly county court in such a matter would have been final and not open to review.

Errors are assigned in behalf of Brown with respect to the action of the trial judge in holding certain votes illegal and deducting such votes from Brown's total, and in refusing to hold that other votes were illegal and deducting such votes from Hows' total. Similar errors are assigned in behalf of Hows.

We assume for the present that it is incumbent upon this court to review the issues of fact raised by these assignments as *de novo*.

It is said that the court was in error in holding that one John Jackson was a legal voter and failing to deduct his vote from the total vote of S. P. Hows.

The question here is as to John Jackson's age. He voted without having paid a poll tax. Jackson was a negro man somewhat advanced in years and any conclusion as to his age must rest upon his statements, in court or out, and upon his appearance. It is obvious that this negro did not know his age. He testified that some of the white folks for whom he or his people had worked told him that he was born in 1874. That would have made him 55 years old in 1929, when the poll tax became due, which must have been paid to qualify voters liable thereto for the 1930 election. Jackson further testified that one of his uncles had told him that he was born in 1879, which would have made him 50 in 1929. He said another uncle had told him that he was born in 1881, which would have made him 48 in 1929. It seems that he procured a marriage license in 1918. This was his second marriage at least, and he gave in his age on obtaining the license as 38. As observed by the trial judge, he probably felt young at that time. In the same year, however, 1918, when the last draft for military service in the World War was made, it seems from his testimony that he claimed to have been 45 at that time and ineligible to be drafted.

He probably felt old at the prospect of undergoing military service. An affidavit was procured from Jackson after this election, obviously at the instance of Brown, in which he gave his age at 49. The contents of the affidavit were, of course, only admissible for the purpose of contradiction.

It being apparent that Jackson did not know his own age, we must give great weight to the finding of the trial judge on the subject. Jackson was before the court and His Honor found: "He appears to be over 50 and I am of opinion he was over 50 at the time of the election from the weight of the evidence."

We have not, of course, the benefit of that observation of Jackson available to the trial judge. In cases involving the age of a youthful offender, whether he is under 18 years of age and upon conviction should go to the reformatory, or whether he is over 18 and upon conviction should go to the penitentiary, this court uniformly accords great weight to the finding of the trial judge based upon the appearance of defendant. We must follow the same practice here.

It is also insisted that Jackson's vote should have been rejected because of his testimony that it was marked for him by one Earl Hows, a brother of the contestant herein, Earl Hows not being an officer of the election. Earl Hows denies this testimony flatly. He says he marked but one ballot at this election, that of a voter named Carter, which will be referred to later. Hows is corroborated by the testimony of one Hutton, an officer of the election, who Jackson said was right across the counter from him when Hows marked his ballot. Hutton said that he saw nothing of Hows marking a ballot for Jackson and that only one ballot was marked for a voter by another at this election, namely, the ballot of Carter, just above men-

tioned. It follows accordingly that there is a preponderance of the proof against Jackson's claim that Earl Hows marked his ballot.

It is next contended that the court erred in adjudging that one Steve Carter was a legal voter and in failing to deduct his vote from the vote of S. P. Hows.

The proof indicates that Carter was an old negro and nearly blind. He was furnished a ballot and asked Earl Hows to mark it for him. Carter had worked for the Hows family. Hutton, the election officer, was sick and asked Earl Hows to mark the ballot, which was done. It appears that the ballot was marked exactly as Carter wanted it.

In *Moore* v. *Sharp*, 98 Tenn., 491, 504, this court said "if a blind man, in good faith, and believing he is submitting his case to the proper officer, blamelessly allows his ballot to be marked by some other person, it should not be rejected." In that case the ballot was marked by one who, though an officer of the law, was not authorized to render this service to the voter.

In the case before us a primary election was being held at the same time and in the same store room at which this general election was being held. Earl Hows was an officer of the primary election. Under the principle announced in *Moore* v. *Sharp, supra,* we do not think this blind voter can be deprived of his vote, when he entrusted the marking of his ballot to Earl Hows, under the direction of the officer who should have marked it, particularly when Earl Hows himself was an officer at the primary. An ignorant voter could not be expected to distinguish between an officer of the primary and an officer of the general election.

Another assignment of error challenges the action of the trial judge in holding that one George Bryant was a

legal voter and refusing to deduct his vote from the total vote of Hows.

The contention is that Earl Hows marked the ballot of this voter. Bryant so testified and likewise testified that he could see very little.

Earl Hows denied vigorously that he marked Bryant's ballot, saying that he marked no ballot except that of Steve Carter. Hows is corroborated by one R. E. Hutton, who was present when Bryant voted, and Hows is strongly corroborated by one Travis, an officer of the primary, who said that he saw Bryant mark his own ballot, being about ten or thirteen feet distant from Bryant.

Again, therefore, it seems that the finding of the trial judge is sustained by the preponderance of the evidence.

It is maintained that the court below erred in refusing to deduct the vote of John T. Garland from the total vote of Hows. The court did find that Garland was an illegal voter but declined to deduct his vote from Hows' total, since it did not appear to the court that Garland had voted for Hows. We think this finding is sustained by the proof. Garland declined to state for whom he voted. It appears that his father voted for Brown and it appears that his wife voted for Brown. His brother-in-law voted and worked for Hows. Garland's father testified that John T. Garland told him on one occasion that he (John T.) would not vote for Brown. Garland was an invalid of years standing, afflicted with tuberculosis. He recalled making no such statement to his father. If he made the statement attributed to him by his father, there is nothing to show that he did not change his mind, as an invalid, especially, is likely to do.

Miss Catherine Gower was held to be an illegal voter but the court refused to deduct her vote from the total vote of Hows, because it did not sufficiently appear that

she had voted for Hows. This action of the court is made the basis of an assignment of error and we think that this assignment of error is well taken.

Miss Gower refused to testify for whom she had cast her vote. There were three election precincts in the Ninth Civil District. Miss Gower voted at the Newsom precinct. Brown received only five votes in that precinct and five voters, other than Miss Gower, testified without contradiction that they had voted for Brown. Miss Gower testified that she voted for two candidates in the magistrate's election. It seems to follow, therefore, that she must have voted for Hows and that her vote should have been deducted.

This gain for Brown, however, does not advance his case when we come to consider the assignments of error made in behalf of Hows. Two of those assignments challenge the action of the court in refusing to deduct from the total vote of Brown either the vote cast by one A. L. Perry or the vote cast by Jim Roberts. The court below was of opinion that the record did not show for whom either of these voters had cast his ballot. The court found that both were illegal voters.

Eighteen witnesses testified without contradiction that they voted for Hows at the Pasquo precinct in this election. As a matter of fact, Hows received only seventeen votes at this precinct but there was one blank vote, and the supposition that one of those voting for Hows neglected to mark his ticket reconciles the testimony of all these witnesses.

In the Pasquo box were found for Brown 116 votes, for Hicks 40 votes, for Hows 17 votes, and one blank vote.

The briefs agree that fifty-nine of those voting for Brown voted for no other candidate for magistrate; that

Brown received 59 single shots; Hicks one single shot; Hows no single shot.

The argument in behalf of Hows is that the testimony accounts for all the votes that Hows received, excluding the votes of Roberts and Perry. Roberts testified that he voted for only one candidate in the magistrate's race. He might have voted for Hicks, since Hicks received one single shot. He could not have voted for Hows. Perry did not testify whether he voted for one or two candidates in the magistrate's race. If he voted for one candidate, he might have voted for Hicks. If he voted for two candidates, one of his votes must have been for Brown and one for Hicks, since the full vote of Hows is otherwise explained. So, the process of elimination which attributed Miss Gower's vote to Hows must attribute the vote of Roberts or Perry, one or the other, to Brown. Both votes being illegal, one must be deducted from Brown.

This conclusion is challenged in two ways by counsel for Brown.

In the first place it is said that the record does not show that Perry voted in the magistrate's race. We do not so read Perry's testimony. Perry was asked if he voted in the Pasquo precinct of the Ninth Civil District on August 7, 1930. He replied, ''I voted in the last election down there, I wouldn't say what date.'' He was then asked: ''That was the general election that was there when Squire Brown and Squire Hicks and Squire Hows were candidates, is that or not true?'' Answer: ''Yes, sir.'' He was again asked: ''Do you mind saying whether or not you voted for Squire Brown?'' Answer: ''I wouldn't give you any indication who I voted for.''

The following questions and answers then appear in Perry's testimony:

"Q. Now, you have stated that you decline to say here in court, Mr. Perry, for whom you voted in that magistrate's race? A. I further say, I haven't stated to any one, since or before.

"Q. But you voted? A. Who I voted for I have left several impressions, but that doesn't count for anything.

"Q. Well, will you say whether you voted for more than one, or just for one? A. No, sir, I won't."

Exception by Mr. Ewing, Jr.: "That is invading his rights, to say whether he voted for one or two. He has the right to decline to say."

From the foregoing we think it distinctly appears to have been conceded by Perry and by counsel for both parties on the trial that Perry did, as a matter of fact, vote in this magistrate's election.

It is urged, however, that in any event Roberts was a legal voter and the court below improperly held to the contrary. We think the court was right.

█ Roberts seems to be a cripple. He produced a certificate of his disability from the County Court of Williamson County reciting that on the third day of October, 1921, he was relieved from poll tax and road work for the term of his disability and on account of said disability. The argument is that this exemption from payment of poll tax and road work in Williamson County exempts him from the payment of poll tax and road work in Davidson County. We do not agree to this.

Section 28 of Article II of the Constitution authorizes the exemption of persons *by law* on account of age or other infirmity from the payment of a poll tax.

Section 1615, et seq., of the Code of 1858 and section 2699, Thompson's-Shannon's Code, confer upon the county courts of the several counties certain powers with respect to supporting and dealing with the poor. Among

other provisions is section 1620, Code of 1858, section 2704, Thompson's-Shannon's Code, that the county court may exempt from working on public roads and paying poll tax any person unable, by manual labor or physical exertion, to make a support whenever it appears to be just and right.

This provision is repeated in section 4212 of the Code of 1858, section 6042, Thompson's-Shannon's Code, said section being embraced in the chapter of the Code dealing generally with the jurisdiction, powers and duties of the county court.

In *Willaford* v. *Pickle,* 81 Tenn. (13 Lea), 672, it was laid down by this court that proceedings under the section of the Code just quoted were not strictly judicial. The court might have gone further. In our opinion, such proceedings are not judicial at all. They are referable to the administrative powers of the county court. The legislature, within constitutional sanction, declared the conditions under which the exemption might be accorded. The county court determines whether or not those conditions exist. Each county court determines for its own county when such conditions exist. The county court of one county is not entrusted with administering the laws with respect to the poor of another county. The County Court of Williamson County was empowered to determine the status of Roberts under the poor laws so long as Roberts lived in Williamson County. The status of a citizen of Davidson County under such laws, however, is to be determined by the county court of that county. The language used in several sections of these laws respecting the poor plainly confines the authority of each county court to the particular county.

Our ruling on the assignments of error heretofore discussed results in a vote of 153 for Hows and 151 for

Brown and necessitates an affirmance of the judgment of the court below.

It becomes unnecessary, therefore, to consider the assignment of error made on behalf of Brown challenging the action of the trial judge in holding that P. B. Robinson, who voted for Brown, was an illegal voter. Giving Brown the benefit of Robinson's vote, Brown's total would be 152.

It likewise becomes unnecessary to consider the assignment of error made on behalf of Hows challenging the action of the trial judge in refusing to deduct the vote of Miss Eva Maj Larkin from the total vote received by Brown. Hows is elected notwithstanding Brown received the benefit of Miss Larkin's vote.

In deference to a practice that has heretofore been followed by this court in cases of this nature, and to avoid injustice, we have undertaken to review the evidence *de novo*, as if this were an equity case. In our opinion, however, such practice has no justification and will not hereafter be followed in election contests coming to this court from the circuit court.

It was contended in *Moore* v. *Sharp,* 98 Tenn., 65, as appears from the first opinion in that case, that no appeal would lie in cases involving election contests triable in the circuit court under section 1309, Thompson's-Shannon's Code; that such court in such cases sat as a special tribunal not exercising judicial functions. This contention was overruled. It was held that the circuit court acted as a court in such matters and that the losing party was entitled to an appeal under the general code provision "any one or more parties to a judgment or decree may pray and obtain an appeal therefrom, the judgment remaining in full force against such of the

parties as do not appeal. Thompson's-Shannon's Code, section 4891.

It was pointed out in the discussion that election contests triable in the county court under section 1308, such as the one before us, were always regarded as legal controversies, appealable from the county court to the circuit court, and from that court to this court. It was recognized both by the court and counsel in *Moore* v. *Sharp, supra,* that section 1326, Thompson's-Shannon's Code, had no application. That section provides for appeals in election contests as to judicial officers, triable before a chancellor, and is that "either party may have an appeal to the Supreme Court, and said appeal shall be governed, in all respects, as appears from the chancery court." This statute is supposed to have been enacted to meet the decision in *Wade* v. *Murray,* 34 Tenn. (2 Sneed), 50, holding that the chancellor in such cases sat as a special tribunal, not exercising judicial functions, and that his decision was not subject to review.

When *Moore* v. *Sharp* came on to be disposed of upon its merits, 98 Tenn., 491, the court said: "While the case is to be tried in this court as an equity case, *de novo,* . . . . our investigations must necessarily be confined to the assignments of error."

No reason for the first proposition was given. Naturally, no authority was cited, since the question of the right to appeal at all was before the court for the first time, as appears from the first report of the case. From the language used by the learned judge and court above, it seems that the court inadvertently assumed that the appeal in *Moore* v. *Sharp* was being prosecuted under section 1326, Thompson's-Shannon's Code, providing for appeals in election contests heard before the chancellor.

This, although the right to appeal in *Moore* v. *Sharp* had been expressly referred to section 4891 of Thompson's-Shannon's Code in the previous opinion therein.

In *Shields* v. *Mahan*, 112 Tenn., 1, the court followed the practice pursued in *Moore* v. *Sharp,* reviewing the record as an equity case, undertaking to give a reason for this procedure. It was suggested that if the same rule was applied to the finding of facts by the trial judge that prevailed in other civil cases there could be no reversal "and practically no review, where the decision of the court below was in favor of the contestee, since he would always come into this court with a certificate of election, which is not only some evidence to support the finding of the trial judge, but is *prima-facie* evidence of the justice of the claim of the contestee."

This reason is not sound. The certificate of election, referred to as *prima-facie* evidence of the justice of the claim of the contestee, creates merely a presumption in favor of the contestee. This court has repeatedly held that such a presumption disappears when rebutted by evidence. A party is not entitled to go to the jury on such a presumption, unsupported, where credible evidence is introduced by the adverse party in contradiction of that presumption. Perhaps the fullest discussion of this matter is contained in the opinion of Judge HUGHES in *Central of Georgia R. Co.* v. *Fuller Combing Gin Co.,* 2 Hig., 343. See also *Marquet* v. *Insurance Co.,* 128 Tenn., 212.

The first opinion of the court, on the motion to dismiss the appeal, in *Moore* v. *Sharp,* shows that there is no difference between an election contest tried in the circuit court and any other case at law.

An election contest is not like a divorce case, an ouster case, or other cases of that nature tried according to the

forms of chancery in the circuit court. In so far as *Moore v. Sharp, supra,* and *Shields v. Mahan, supra,* hold that election contests tried in the circuit court are to be reviewed on appeal differently from any other case at law, these cases will not be hereafter followed.

For the reasons stated, the judgment of the court below is affirmed.