BRYAN v. AETNA LIFE INS. CO. No. 4.—160 S. W. (2d) 423.

Eastern Section. September 5, 1941.

Petition for Certiorari denied by Supreme Court February 7, 1942.

Lee, Cox & Hier and Kennerly & Key, all of Knoxville, for appellant.

Clements & Clements and K. E. Steinmetz, all of Knoxville, for appellee.

McAMIS, J. On January 14, 1935, the Aetna Life Insurance Company, defendant below, issued to Augustus P. Bryan a policy of life insurance in the sum of $5,000 payable to Gladys Smith Bryan, his wife. Augustus P. Bryan died January 3, 1936, under circumstances to be related, as the result of a bullet wound in the right temple. The policy contained a provision limiting the liability of the insurer to a return of the premiums paid in case insured should commit suicide within two years from the date of the issuance of the policy.

The widow, as beneficiary under the policy, filed the original bill herein November 18, 1937, seeking a recovery upon the policy. The insurer, to be referred to as defendant, answered the bill asserting that Augustus P. Bryan committed suicide and invoking as the sole ground of defense the suicide provision of the policy. Upon the pleadings a single issue was formulated: "Did Augustus P. Bryan commit suicide?" This issue has been submitted to three juries. The first jury resolved the issue of suicide in favor of the beneficiary. The Chancellor overruled defendant's motion to withdraw the case from the jury upon the ground that there was no evidence to support a verdict in favor of the complainant and overruled a motion for a new trial. Upon appeal to this Court the verdict of the jury was sustained but the Supreme Court granted certiorari and, upon a hearing, concluded that the Chancellor correctly declined to withdraw the case from the jury and dismiss it, as insisted by defendant, but that the case should be reversed for error in the charge to the jury. The opinion by Chief Justice Green is reported under the style of Bryan v. Aetna Life Insurance Company, 174 Tenn., 602, 130 S. W. (2d) 85, 86.

Following the remand ordered by the Supreme Court the case was again tried before the Chancellor and a jury and at the conclusion of all the evidence defendant again moved the court to withdraw the case from the jury and dismiss the suit for lack of evidence to support a verdict in favor of complainant. This motion was overruled and the case submitted to the jury resulting in a mistrial because of the inability of the jury to agree upon a verdict. The evidence and proceedings at the second trial have been preserved by a wayside bill of exceptions.

At the last trial defendant at the conclusion of all the evidence again moved the court to discharge the jury and enter a decree in its favor because there was no substantial evidence requiring the submission of the case to the jury. This motion was overruled, the case submitted to the jury and the issue of fact resolved in favor of complainant. Defendant thereupon filed a motion for a new trial which was overruled and it has appealed in error to this Court, insisting

that in view of certain additional facts bearing upon the issue of suicide appearing in evidence at the second trial, now preserved by the wayside bill of exceptions, and additional facts reflecting upon this issue under the proof adduced at the last trial the Chancellor erred in not withdrawing the case from the jury and entering a decree in favor of defendant. It is insisted that, under the proof now appearing in the record, suicide of the insured has been established as a matter of law. Other assignments relating to the charge of the court and the exclusion of certain evidence are made. Under the established rule we review first the action of the court in submitting the issue of suicide to the jury at the second trial as reflected by the wayside bill of exceptions.

As already noted, the Supreme Court held the proof introduced at the first trial sufficient to carry the case to the jury. Since it is now insisted that additional facts establish the suicide of insured as a matter of law, for convenience and for the purposes of comparison we quote from the opinion of the Chief Justice the concise summary of the facts appearing in evidence at the first trial and upon which the Supreme Court concluded that, at that trial, the case was properly submitted to the jury:

''The insured drew a salary of $200 a month. Evidence in the case indicates that he had accumulated some property and was worth about $5,000 at the time of his death. Other evidence introduced indicates that some discrepancies were discovered in his accounts after his death. These discrepancies, however, amounted to only $200 or $300, and it is possible that they resulted from irregularities rather than any conscious wrongdoing on the part of the insured. At any rate, these discrepancies had not been discovered during his lifetime, he was not being pressed about them, and he seems to have been abundantly able to adjust them.

''The insured had lived in Knoxville but a short while at the time of his death. Previously he had worked in Chattanooga, in Tampa, Florida, and perhaps other places in the same line of business. There is proof indicating that he was not satisfied with his local employment at Knoxville and had made application to another loan company for a similar job shortly before his death without success.

''So far as the record shows, there was nothing in the home life or the business life of the insured to make existence unbearable and we are not able to discover a motive for suicide on the evidence appearing in this record.

''On the morning of January 3, 1936, the insured left his home in good spirits, according to his wife, and reached his office at about eight-thirty, according to the testimony of employees there. These employees noticed nothing unusual in his demeanor. After being in the office for a few minutes, the insured left to inspect certain property upon which an application had been made for a loan.

"Shortly after nine o'clock, at a point on the Ramsey Ferry Road, a few miles out of Knoxville, an automobile was seen by a witnesses Ford to stop for a few minutes, back up a short distance, and turn off on a road that led from this highway to a place known as the Kreis Dairy Farm. The automobile proceeded along this dairy road for a short distance and stopped on the side of the road. A little later in the morning, the insured was found in this automobile, shot through the head, with a pisol in his hand. An ambulance was summoned, insured still being alive, but he died on the way to the hospital.

"The witness Ford, who saw this car stop on the highway and then turn up the dairy road, noticed but one person in the car. The point at which the car came to rest was about 315 feet from the river and from a house boat in which the witness Ford and his family lived. Ford said that the car was within his view during the time it stood on the dairy road. That he was sitting at the window looking at the car almost constantly, only getting up occasionally to go to the stove to spit. He was chewing tobacco. Ford did not see anyone approach or leave the car and, as stated above, he noticed only one person in the car.

"Obviously the insured could not have operated this car in the manner in which Ford testified had he received this wound in the head before the car came within Ford's vision. However, although he said he was looking at the car nearly all the time, and evidence indicates that his house boat was a flimsy structure, Ford heard no shot while the car was stopped on the dairy road or before—the distance of the car from Ford being about 100 yards. The pistol found in the insured's hand was a .32 caliber, long-barreled, Smith & Wesson.

"Two witnesses, going to the Kreis Dairy Farm on business, passed the automobile in which the insured was found as that car stood on the side of the dairy road. These witnesses paid no attention to the car or the occupant as they passed. Shortly after they reached the dairy farm, a woman seems to have passed the parked car, noticed something that excited her very much, and came to the farm in a flustered condition. On her report, the witnesses who had previously passed the car went back to make an investigation. They stopped their own car, got out and went to the other car, saw the body of the insured slumped over, the pistol in his hand and pointing out the window. Seeing insured with a pistol, not realizing his condition, the witnesses summoned officers who arrived shortly.

"The window on the driver's side of the car was down. All the other windows of the car were closed. There was no broken glass or any sign of a bullet in the car. The clothing of the insured did not appear to be disarranged. The proof tends to show that the insured did not own a pistol. Neither did he own an automobile. There is no evidence in the record tending to show to whom the pistol in the insured's hands, or the automobile in which the insured was

found, belonged. Nobody knows the owner either of the weapon or of the car.

"The body of the insured was sent to his old home in Tampa, Florida, for burial. Some three weeks thereafter, it was disinterred and an examination made of his head by a pathologist, apparently of good qualifications and experience. This doctor testified as to the course of the ball through the head. It entered on the right side and lodged under the skin on the left side. The doctor removed the bullet and it seems to have been offered in evidence. This witness testified that there were no signs of powder burn about the point of entry of this bullet. That powder burn is a sort of tattoo and does not wash off when a body is prepared for burial. The witness further testified to certain discolorations about the face and eyes of the insured which he seemed to be of opinion resulted from violence, not disintegration. The path of the bullet through the head, in the opinion of the witness, negatived any idea that these discolorations resulted from the gunshot wound.

"Evidence was introduced tending to show that the insured was a small man and that he could not himself have held a pistol of the kind found in his hand far enough away from himself to avoid powder burns when such pistol was fired into his head. Only one shot had been fired out of the pistol found and tests were made with this weapon and ammunition showing the distance at which its fire would cause powder burns. These tests tended to support the theory that the insured could not have shot himself with this weapon.

"The foregoing are the substantial facts of the case and such being the facts defendant Insurance Company insists that it was entitled to have the chancellor withdraw the case from the jury and render a decree in its favor on the evidence. We think the Court of Appeals properly overruled this contention. It seems to us that reasonable men might draw different conclusions from the proof detailed as to whether the insured killed himself or was killed by another." See Bryan v. Aetna Life Insurance Company, supra.

After thus stating the material facts, the opinion continues:

"The ownership of the car and the ownership of the pistol is enveloped in mystery. The only proof is that neither the car nor the pistol belonged to the insured. It does seem if the owner of the automobile and the owner of the weapon had been innocent of the insured's death, his identity would have been easily established and the insured's possession of these agencies would have been explained. This, together with the absence of powder burns on the insured's head and other circumstances rendered the case one appropriate for submission to a jury to determine the question of suicide."

It goes without saying that unless the facts adduced after the remand are materially different it was the duty of the Chancellor to submit the issue of suicide to the successive juries impannelled to

try that issue. In behalf of defendant, however, it is insisted that the additional facts now appearing in the record make the question of suicide one of law for determination of the court. It is said that the "missing links" in the evidence which, from the language of the opinion, induced the court to conclude that the case was one appropriate for submission to the jury have now been supplied.

Learned counsel for complainant, on the other hand, insist that, while there may be additional facts appearing in the records now before the court, the same facts which have been held to render the case one for the jury still remain with their force unimpaired and constitute material evidence sustaining the verdict of jury. It is insisted that these facts, together with the presumption against suicide, sustain the verdict of the jury.

Before considering this question it is well to note the prevailing principles governing its determination. In Bryan v. Aetna Life Insurance Company, supra, the opinion refers to the general rule that it is sufficient in a civil case depending on circumstantial evidence for the party having the burden of proof to make out the more probable hypothesis and that the party having the burden of proof need not establish his case by that degree of certainty sufficient to exclude every other reasonable conclusion; and it was held that it was error to charge the jury, in effect, that the burden was upon defendant to prove suicide to the exclusion of any other reasonable hypothesis, or beyond a reasonable doubt. 174 Tenn., 611, 130 S. W. (2d), 85.

Noting that we have a number of decisions holding that a bare presumption disappears upon the introduction of circumstantial rebutting evidence (Marquet v. Aetna Life Insurance Company, 128 Tenn., 213, 159 S. W., 733, L. R. A., 1915B, 749, Ann. Cas., 1915B, 677; Brown v. Hows, 163 Tenn., 138, 40 S. W. (2d), 1017; Central of Georgia R. Co. v. Fuller Combing Gin Co., 2 Tenn. Civ. App. (2 Higgins), 343), it was, nevertheless, said:

"The first and second requests raise the point considered at length in Provident Life and Accident Insurance Company v. Prieto, supra [169 Tenn., 124, 83 S. W. (2d), 251], as to whether the presumption against suicide can be considered as evidence when proof on the subject has been introduced. This question was decided in the affirmative in that case."

Looking to the Prieto case, 169 Tenn., 124, 83 S. W. (2d), 251, 256, it is observed that in that case the circumstances led to conflicting conclusions as to the cause of death, whether by accident or suicide, and we find no authority for holding that the presumption against suicide remains as evidence in the case in the sense that the issue of suicide must always be submitted to the jury no matter how plain the circumstances excluding other causes.

In the course of the opinion in the Prieto case, the court quotes from Mutual Life Insurance Company v. Gregg, 6 Cir., 32 F. (2d) 567, 568, apparently approvingly, as follows:

"The question for the reviewing court must be just the same as in any other kind of a lawsuit tried by a jury. Does the evidence, taken in the most favorable light for plaintiff, compel all reasonable men to accept the theory of suicide? If so, a verdict will be directed for defendant; otherwise not; and in this inquiry, as in every other case where the jury may rightfully refuse to accept that theory which is the natural and prima facie correct inference from all the facts, there must be some other theory fairly reconcilable with the admitted facts, and which is reasonably possible rather than merely fantastic."

We think the true rule is that where the reasonable probabilities from all the evidence, in the light of reason and common sense, all point to suicide, and are inconsistent with any other theory, the court should not leave the issue of suicide to the jury, but should decide as a matter of law that the insured committed suicide. Hassencamp v. Mutual Ben. Life Ins. Co., 4 Cir., 120 F., 475, 56 C. C. A., 625; Michalek v. Modern Brotherhood, 179 Iowa, 33, 161 N. W., 125; Green v. New York Life Ins. Co., 192 Iowa, 32, 182 N. W., 808; Deweese v. Sovereign Camp, Woodmen of the World, 110 Kan., 434, 204 P. 523; Sovereign Camp W. O. W. v. Hruby, 70 Neb., 5, 96 N. W., 998; Hardinger v. Modern Brotherhood, 72 Neb., 860, 101 N. W., 983, 103 N. W., 74; Agen v. Metropolitan Life Ins. Co., 105 Wis., 217, 80 N. W., 1020, 76 Am. St. Rep., 905; Hart v. Fraternal Alliance, 108 Wis., 490, 84 N. W., 851.

Taking these as the principles governing appellate reviews in cases of this kind, are the facts, as now fully developed, sufficient to exclude accident or murder as the cause of death and overcome the presumption against suicide? Juries and even courts are properly reluctant after the policyholder has been silenced by death to conclude that he came to his end by his own voluntary act. For this reason the aid and comfort of the presumption against suicide are frequently sought but the court is not justified in shutting its eyes to the fact that men, without any apparent reason, do commit suicide.

In the instant case, there is no suggestion that insured met death as the result of an accident and we have concluded after careful consideration that the facts are all inconsistent with the theory of murder.

On the second and third trials, defendant introduced proof showing that insured left his office on the morning of the tragedy in company with an applicant for a loan accompanied by her son approximately twenty years of age. As he passed along the street in company with these two persons he repelled all efforts at conversation and was seen to stop and look intently toward a pawn shop. After

inspecting the property to be pledged for the loan, insured left the applicant and her son probably between eight-thirty and nine o'clock.

Between that hour and sometime before twelve o'clock noon, the pawn broker being unable to remember the exact hour, a neatly dressed man wearing dark clothes (insured had on a dark overcoat) entered a pawn shop near where insured had left the loan applicant and her son. After some discussion as to the price to be paid the pawn broker sold the .32 caliber, long-barreled, Smith & Wesson pistol which was found clutched in the right hand of insured when he was discovered on the Kreis Dairy Farm Road. The pawn broker testified that he did not remember whether he sold any shells for the pistol and stated that it was his custom to wrap such articles in newspapers as they were delivered to customers.

An acquaintance of insured testified that he saw him carrying an article under the pit of his arm wrapped in a brown paper bag. He thought the bag was too small to contain the pistol in question but was uncertain to some extent as to whether this was on the day of the death of insured.

It appears that insured proceeded from the point where he was seen by said acquaintance to the garage where his employer, Tennessee Finance Corporation, stored repossessed cars. The attendant at the garage testified that when he came into the garage he carried a package. At this point he took one of his employer's cars and placing the package on the front seat beside him left the garage alone, going east in the direction of the point where he was found shortly thereafter. The car in which he left was later identified as the one in which he was found.

Much stress is laid by counsel for complainant upon certain discrepancies in appearance between the man who purchased the pistol at the pawn shop as to complexion, the color of his hat, etc.; also upon the fact that the witness Ford testified that the man in the car which stopped in front of his house was light complexioned, whereas deceased was a brunette. These are largely matters of opinion and should not be given too much weight especially after the lapse of several years and, in any event, we think the fact that deceased was found with the gun clearly establishes, in the absence of any contrary proof, that insured was the purchaser of the gun from the pawn broker on the morning of the tragedy. It is argued that deceased could have been murdered and the gun placed in his hands by the murderer but this explanation overlooks the fact that the shells found in his pocket were .32 caliber shells and, as pointed out in the opinion of the Supreme Court, insured was not known to possess a gun. It can hardly be reasonably assumed that the murderer would have stopped to place ammunition in his pockets.

Thus is clearly established by evidence which we regard as wholly uncontradicted the purchase by insured of the pistol found clutched

in his right hand a few minutes after the car was parked within the vision of the witness Ford. Likewise, the identity of the car as one belonging to insured's employer is uncontroverted.

With the testimony of the witness who saw insured place the package on the seat beside him in the record, the testimony of Ford as to what occurred after the car was parked on the Kreis Dairy Road takes on added significance.

Ford testified that after the car stopped the man under the wheel began moving around and appeared to be lifting some object. Later it appears that he removed his hat and went out of sight of the witness. The moving around in the car and lifting of an object described by Ford are logically attributable to the handling and unwrapping of the pistol and the raising of the pistol to shooting position. All of the witnesses agree that insured was seated originally under the wheel and had slumped over on the front seat to the right, thus showing (regardless of what his complexion appeared to be to Ford) that insured was at the wheel and controlling the movements of the car after it came within Ford's vision. The proof further shows that insured's hat was in the position it would have occupied if taken off by deceased, as related by Ford, and placed on the front seat.

All of these circumstances appear to us wholly inconsistent with the theory of murder and all of them are consistent with the theory of suicide. As observed by the Supreme Court, insured could not have operated his car in the manner shown if he had sustained the gunshot wound from which he died before coming into the neighborhood of the Ford residence. No one else was seen in the neighborhood by any of the witnesses and it is significant that when the man under the wheel who turned out to be insured passed from Ford's vision no one was seen around the car. This must have been the instant when insured was shot and the instant when the murderer, if one had been on the scene, would have made good his escape. Ford was watching the car at this time and saw no one.

As to the discoloration of insured's left eye revealed by autopsy, medical testimony now in the record reveals that the discolorations found three weeks after insured was buried might have resulted from the tearing of the brain tissues caused by the passage of the bullet through the brain. The pathologist who described these discolorations concedes that discolorations may result at a point some distance from the injury to some other portion of the body. It is true he said these discolorations are not found in persons who met death as the result of natural causes but such was not the cause of the death of insured. It results that the conditions described are reconcilable with the theory of suicide and fail to support the theory that insured engaged in combat before he was shot. No witness, including the embalmer and the doctor who examined insured when he was brought to the hospital, saw any evidence of abrasions or bruises on his person,

The absence of powder burns at the point of entry of the bullet is now explained by the fact that if the barrel of the pistol was placed against the head before it was fired the flame would have entered the cavity made by the bullet and would have caused a "ragged" wound such as described by the pathologist who performed the post-mortem examination.

Every circumstance revealed by the record points most convincingly to the conclusion that insured purchased the pistol at the pawn shop after leaving the loan applicant and her son and drove out in one of his employer's cars for the purpose of taking his life; that when he reached the point in question he unwrapped the pistol which was on the seat beside him, removed his hat, placed it bottom down on the seat beside him, as it was found later, raised the pistol to his temple and fired it. He is not shown to have had an enemy who would have sought to end his life. He had no business for his employer near the Kreis Dairy. He left the garage alone and to assume that some enemy could have foreseen that he would take this particular car and concealed himself, in some manner, in the car or that an enemy could have gained entrance to the rear of the car without insured's knowledge and then to assume further that insured would have driven to this particular point to enable such an enemy to take his life is fantastic in the extreme.

As to the earnest insistence of counsel for complainant that the facts upon which the Supreme Court held the case one for the jury still remained in the record at the two trials now under review and justified the action of the Chancellor in again submitting the issue of suicide to the jury, we need only point out that it is the duty of the court, upon motion to withdraw the case from the jury, to consider all the evidence offered by the movant and accept it as true if not contradicted by, or inconsistent with, credible evidence offered by the party desiring a jury verdict. Martin v. Braid Electric Co., 9 Tenn. App., 542; Corder v. Lane, 18 Tenn. App., 51, 72 S. W. (2d), 570; Town of Dickson v. Stephens, 20 Tenn. App., 195, 96 S. W. (2d), 201.

The two assignments complaining of the action of the Chancellor in refusing to withdraw the case from the jury and dismiss the bill are sustained. Since we have concluded that the Chancellor should have taken this action at the second trial from the facts appearing in the wayside bill of exceptions, it is unnecessary to deal in this opinion with other assignments. However, for the purpose of the record the assignments complaining of the charge of the court and the exclusion of certain evidence will be overruled. Complainant's suit will stand dismissed and the costs adjudged accordingly.

Portrum, J., concurs.

Ailor, J. (dissenting).

I find myself unable to agree with the conclusions of the majority opinion in this case. The case was before us on a former occasion and we held that there was evidence to take the issues to the jury. The decree of this court was reversed by th Supreme Court on a question of law. In the opinion by Judge Green reversing this court there was a detailed statement of evidence which made questions for submission to the jury. All of this evidence held to be sufficient to take the case to the jury is still in the record. It is true that some of this evidence is controverted, but this does not change the situation. This being my view of the case, I am of opinion that a question for the jury still remained and that the verdict of the jury was conclusive of the facts.