JOSEPHINE H. ALLEN, GUARDIAN OF ROBERT JOHN ALLEN AND MARGARET A. ALLEN, MINORS, APPELLEE, V. MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, A CORPORATION, APPELLANT.

30 N. W. 2d 885

Filed February 6, 1948.    No. 32290.

*Brown, Crossman, West, Barton & Quinlan* and *John R. Cockle,* for appellant.

*Spier, Ramsey & Ellick,* for appellee.

Heard before SIMMONS, C. J., PAINE, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ., and LANDIS, District Judge.

SIMMONS, C. J.

This is an action by a legally-appointed guardian to recover on a life insurance policy. The policy was issued September 1, 1944, on the life of Leo J. Allen, with the wards named as beneficiaries. The insured died December 22, 1945. The company defended on the ground that the policy contained the following provision: "If within two years following the date of issue of this policy and while it is in full force, the insured, whether sane or insane, shall die by his own hand or act, the Company will be liable only for the amount of the premiums paid hereon, which amount shall be paid in one sum to the beneficiary herein." The com-

pany alleged that the insured died by his own act; and that its liability was to pay the amount of the premiums paid, which amount it tendered to the plaintiff. Trial was had resulting in a verdict and judgment for the plaintiff for the full amount of the insurance. Defendant appeals. We affirm the judgment of the trial court.

Plaintiff is the mother of the beneficiaries. Plaintiff and the insured were married in 1933 and divorced in 1944. Insured remarried. The policy, introduced by plaintiff, contained the clause upon which defendant relied. The proof of death, signed by a physician and admitted in evidence without objection on cross-examination of plaintiff, recited that the immediate cause of death was "Muriatic Acid Poisoning Self administered"; that contributing causes were "Toximia, and errosion of the stomach mucosa." The form then included this question: "(a) Was there a post mortem examination? (b) If so, by whom and what did it disclose?" The answer to (a) was "Yes." The answer to (b) was "Self - Muriatic Acid Poisoning." It was stipulated that the policy was in full force and effect at the date of the death of the insured. With the evidence as above, plaintiff rested.

Defendant's evidence, in a somewhat chronological order, was as follows. On December 21, 1945, a man of medium height and dressed in working clothes bought a bottle of muriatic acid at a pharmacy. The acid was delivered in a round bottle about seven or eight inches high and three inches in diameter. It was labeled "Muriatic Acid" "Poison" with skull and crossbones on the pharmacy label. Generally a brown bottle was used as a container in selling this acid. It is a common article of merchandise and often sold by druggists for cleaning purposes and used by plumbers in soldering. The salesman viewed the insured's body after death. He was unable positively to identify the insured as the purchaser of the acid.

The next events rest largely upon the testimony of the insured's stepson. At times it is confusing and conflicting. On direct examination he told of going home about six in the evening of December 21. His mother was away caring for an aunt. He testified that he found his stepfather lying on a davenport in a room adjoining the kitchen, coughing up blood into a pan. On the kitchen cabinet he found a white glass bottle about six inches high and about two and one-half inches in diameter, marked "Poison" with skull and crossbones. He took it outside and broke it against the house. He later described the bottle as having a "short neck" and the liquid as being up into the neck when he found it. He got some clothes for his mother and went to his aunt's and told his mother what had happened. He then returned about 10 or 10:30 with an uncle, found his stepfather still on the davenport, and still vomiting into the pan. The witness took jewelry and money of his mother and went to his uncle's home. On cross-examination the witness testified that before the evening in question insured appeared to have been drinking. His deposition had been taken previously, and he admitted he had testified by deposition that when he came home at 6 the insured "walked in the door as I came out." He testified that insured was "humped over" and did not walk very well, and "You could tell from his eyes he had been drinking; he glared." He further testified that he returned to the home about 8:30 or 9 p. m., and that insured was then on the couch and he had no conversation with him at the time. It was on this trip that he said he found and broke the bottle.

The evidence also is that during the night the insured's wife made complaint to the police, and two policemen and the stepson again went to the home about 6 a. m. on December 22. They found insured upstairs and in bed. They had him dress and took him to the police station. One of the policemen went outside and found

a part of a broken bottle. It is in evidence. It is of clear rounded glass; the torn label remaining has in typing "atic acid," and then in red printing "nts" "son" "buted by" "Ph."

The defendant on direct examination of the stepson asked him if he talked to the insured when he was lying on the davenport coughing up blood. He answered, "No—I asked him what was the matter with him." The parties allowed the answer to stand. He was not then asked what the insured answered, if anything. On cross-examination he was asked if he had any conversation with insured when he was on the couch. He answered, "No." He answered that insured made no statements to him when he returned the third time with his uncle. He further testified that the insured made no statement to him at the time he returned with the police officers, but did to the police officers. He was asked what that statement was, and on objection of the defendant was not permitted to answer. The witness then stepped aside temporarily.

The police surgeon was called as a witness and testified that he first saw the insured at the city jail; that the insured was not intoxicated at that time; that he examined him; that he asked him what his trouble was and insured said, " 'I tried to kill myself.' * * * 'I have been drinking and quarreled with my wife. I wanted to die' "; that he had taken muriatic acid; and that there were no burns in insured's mouth and he doubted insured's story of taking the acid. The surgeon further testified that he made a post mortem and found in the esophagus and stomach the evidence of a severe burn; that the acid was "probably gulped down"; that muriatic acid is a slow-acting poison; that a teaspoonful would kill a man and that vomiting is an important symptom; and that he signed the proof of death to which reference has been made, and a death certificate was filed.

After the police surgeon had testified the stepson was

recalled and was asked on cross-examination about the time he was there with the police officers and if the insured made any statement to him about poison. He answered, "No." He then was asked as to his deposition and as to whether or not he had been asked this question and given this answer: " 'Q. That he had taken poison? A. That he accidentally, oh, well, he said that he - well, he didn't come out and say it, but he told me that he got ahold of the wrong bottle, that is the very words he said.' " Over objection that it was hearsay, improper method of impeachment, not part of the res gestae, and not proper cross-examination, he was permitted to answer. He said, "Well, yes."

The plaintiff in rebuttal produced as a witness one of the police officers who testified to going to the home on the morning of December 22 and asking the insured what the trouble was. He then was asked to state what the insured said. The defendant objected to the question because "it is now shown this witness made an inquiry * * * as to what the trouble was," and further that it was no part of the res gestae, too remote, hearsay, and not binding upon the defendant. The court permitted the witness to answer. The witness stated the insured said he had been drinking and drank something by mistake and that on the way to the station the insured said he "drank this stuff by mistake" and wanted a doctor. A motion to strike was made and overruled.

The defendant moved for a directed verdict. The motion was overruled.

As to the evidence, defendant assigns as error (1) the overruling of its motion for a directed verdict, and (2) "The Court erred in receiving in evidence testimony of witnesses, Walter Wilson and Jack Tinsman, over the objection of the defendant. (Such testimony was hearsay, not res gestae, narrative of a past event, obtained as a result of inquiries directed to Leo J. Allen, and not spontaneous. The continuity was broken.)" Walter

Wilson is the police officer; Jack Tinsman is the step-son whose evidence has been recited.

The determination of the first assignment requires first a determination of the second.

Defendant argues that the evidence of the two witnesses named relating statements made by insured was inadmissible for the reasons given, and at the same time argues that the evidence of the police surgeon relating statements made by the insured was admissible. Defendant's contention as to the admissibility of the police surgeon's testimony is based on the following provision in the Application for Insurance: "I expressly waive, to such extent as may be lawful, on behalf of myself and of any person who shall have or claim to have any interest in any policy issued hereunder, all provisions of law forbidding any physician or other person who has attended me or examined me, or who may hereafter attend or examine me, from disclosing any knowledge or information acquired thereby, and I expressly authorize such physician or other person to make such disclosures."

The effect of the waiver is to remove the prohibition of section 25-1206, R. S. 1943, and to permit the physician to testify. Falkinburg v. Prudential Ins. Co., 132 Neb. 831, 273 N. W. 478. It places the witness on a parity with any other witness. It unlocks the lips of the witness and makes him competent to testify. The evidence of the physician, when the waiver is made, is subject to the same rules that apply to any other witness. It would be a manifest injustice to construe the waiver clause so as to permit the insurer to offer evidence through the lips of a physician and at the same time bar all other evidence of like character by other witnesses.

The trial court did not permit the introduction of the evidence here questioned until after the defendant had introduced the testimony of the physician as to statements made by the insured. The statements made to

the physician were the last in time of those attributed to the insured.

The cross-examination was proper unless there inhered in the statement made matter which was not admissible as evidence. Either one of two situations must be true. If the evidence of the physician as to the statements made to him by insured was competent and admissible, then the evidence of the statements made to the stepson and policeman likewise was competent and admissible, and that ends the matter. If the evidence of the stepson and policeman was incompetent and inadmissible, then likewise and for the same reasons the evidence of the physician was incompetent and inadmissible. The defendant in that event is confronted with the rule that a party may not successfully complain of the introduction of evidence of a like character to that which it has introduced. Serratore v. Miller, 130 Neb. 908, 267 N. W. 159; Hoagland & Co. v. Scottish Union & Nat. Ins. Co., 131 Neb. 112, 267 N. W. 242. See, also, Modern Woodman Accident Ass'n v. Shryock, 54 Neb. 250, 74 N. W. 607. The fact that the evidence of defendant was received without objection by plaintiff does not affect the application of the rule. The material fact is that defendant offered the evidence and it was received.

Under the circumstances here the assignment of error is not sustained.

This brings us back to defendant's first assignment that the trial court erred in overruling defendant's motion for a directed verdict. Defendant contends that the undisputed facts and circumstances lead naturally, rationally, and unmistakably to but one conclusion, and that is that insured came to his death by suicide.

In an action upon a policy of life insurance the burden of proof is upon the defendant to prove by a preponderance of the evidence a controverted defense that the insured died as a result of poison self-administered with suicidal intent. Schrader v. Modern Brotherhood

of America, 90 Neb. 683, 134 N. W. 267; Falkinburg v. Prudential Ins. Co., *supra.* See, also, Modern Woodmen of America v. Kozak, 63 Neb. 146, 88 N. W. 248; Scherar v. Prudential Ins. Co., 63 Neb. 530, 88 N. W. 687; Sovereign Camp of the Woodmen of the World v. Hruby, 70 Neb. 5, 96 N. W. 998; Hardinger v. Modern Brotherhood of America, 72 Neb. 860, 101 N. W. 983, on rehearing, 72 Neb. 869, 103 N. W. 74; Walden v. Bankers Life Ass'n, 89 Neb. 546, 131 N. W. 962. The trial court instructed the jury in accord with these decisions in the following language: "You are instructed that the burden of proof is upon the defendant insurance company in this case to prove by a preponderance of the evidence that the insured, Leo J. Allen, died as the result of poison, self-administered, with suicidal intent. In this connection you are instructed that suicidal intent means a voluntary self-killing with the intention on the part of said Leo J. Allen to produce death. Death by accident or mistake or even as the result of some act done intentionally, but without the intention to produce death, is not suicide for the purposes of this case. Accordingly, if the defendant has proved by a preponderance of the evidence that the insured, Leo J. Allen, did take poison with the intent of taking his own life, and as a result thereof he died, then your verdict will be in favor of the defendant. However, if the defendant has failed to prove the foregoing proposition by a preponderance of the evidence, then your verdict will be for the plaintiff." The defendant makes no objection to this instruction here.

The statement made by the doctor, contained in the proof of death, that death was caused by self-administered poison obviously was based on what the insured allegedly told the physician and does not go to the extent of admitting suicide. In the second answer in the statement by the physician, "Self - Muriatic Acid Poisoning," the "Self" obviously refers to the "by whom" in the question and is that the physician making the

statement performed the post mortem. Such statements are not conclusive of the fact. Modern Woodmen of America v. Kozak, *supra*.

To hold that the court should have directed a verdict for the defendant would be to decide that important fact question that this evidence presents as to whether the insured took the poison intending to commit suicide or by mistake. The trial court did not err in denying the motion for a directed verdict.

Defendant further assigns as error the refusal of the court to give certain tendered instructions. These will be reviewed in the light of the rule that "A judgment will not ordinarily be reversed for refusing to give tendered instructions where other instructions given by the court fairly and correctly covered the issues involved in the tendered instructions." Blanchard v. Lawson, 148 Neb. 299, 27 N. W. 2d 217.

Defendant requested the giving of these instructions and assigns the refusal to do so as error:

"You are instructed that the presumption against suicide is only a rule of evidence concerning which party shall first go forward with the evidence to sustain the matter, but this presumption disappears when evidence to the contrary is introduced."

"You are instructed that the presumption against suicide prevails when the cause of death is unknown, but disappears when evidence is introduced tending to show the cause of death."

It is noted that these tendered instructions made no reference to the burden of proof.

The trial court instructed the jury that "* * * in the absence of evidence to the contrary, the legal presumption is always against suicide, * * *." See instruction No. 5 hereinafter quoted. This seems fairly and clearly to state the substance of the requested instructions. The error assigned is without merit. See Falkinburg v. Prudential Ins. Co., *supra*.

The defendant assigns as error the refusal to give

requested instruction No. 4. It is: "You are instructed that the suiside (sic) clause in the policy in suit, in the following language: (clause copied) is valid and enforceable." Defendant contends that the trial court should have advised the jury definitely as to this clause and that the beneficiaries were bound by the insured's contract with the company in this regard. As we read the instructions, the trial court in effect did so. The trial court in instruction No. 2 outlining defendant's answer set out the clause and that defendant alleged that by reason of the death of the insured by his own act within two years of the date of issue of the policy, it became liable for only the amount of the premiums, which it tendered. This was followed by instruction No. 4 above set out. Obviously, the defense was based on the clause in the policy and certainly no construction could be put on the instructions other than that the clause was a valid and enforceable contractual provision. The assignment is without merit.

The defendant assigns as error the refusal to give tendered instruction No. 7, which is as follows: "You are instructed that where the suicide clause is in the language as set forth above in Instruction No. 4, that such is a contractual stipulation between the insured and the insurance company and the condition of the mind of the insured at the time the act was committed is immaterial, nor is it material whether or not the insured, Leo J. Allen, was unconscious of the moral and physical consequences of the act which caused his death." That part which refers to the contractual stipulation has just been answered. There is some evidence that the insured had been drinking before the event in question, but we find no evidence that required the giving of an instruction bearing upon the condition of the mind of the insured. The trial court did not err in refusing to give the tendered instruction.

Defendant assigns as error the giving of instruction No. 5. It is as follows: "You are instructed that, in

the absence of evidence to the contrary, the legal presumption is always against suicide, and, consequently, the burden of proving self-destruction is upon the party pleading it, who, in this case is the defendant insurance company. In other words, the plaintiff in this case, Josephine H. Allen, Guardian, is not required to prove that Leo J. Allen did not commit suicide, but, rather, the defendant insurance Company is required to prove to your satisfaction by a preponderance of the evidence that he did commit suicide. If the defendant insurance company fails to establish this defense by a preponderance of the evidence, or if the evidence is evenly balanced, or if it preponderates in favor of the plaintiff, then and in all of such cases your verdict shall be for the plaintiff."

Defendant's first criticism of the instruction is that by the use of "prove to your satisfaction by a preponderance of the evidence," the court placed a greater burden upon it than the law requires. Defendant relies upon Hyndshaw v. Mills, 108 Neb. 250, 187 N. W. 780, where the instruction was that the defendant was required to prove to the jury's "satisfaction" that false representations were made, and upon McCord-Brady Co. v. Moneyhan, 59 Neb. 593, 81 N. W. 608, where the instruction was that a waiver "must be clear and unequivocal, and must be established by a preponderance of the evidence." We held that the instructions in the above case required more than a preponderance of the evidence and were prejudicially erroneous.

The rule is: "Instructions should be considered together in order that they may be properly understood, and when, as an entire charge, they properly submit the issues to the jury, the verdict will not be set aside for harmless error in one of them." Blanchard v. Lawson, *supra.*

The use of the language objected to is at most a harmless error under the instructions that were given. It is noted that in instruction No. 4 the court used the words

"preponderance of the evidence" twice in that instruction, and in instruction No. 5, after the criticized language, "the preponderance of the evidence" again was made the test. By instruction No. 7, the court defined "preponderance" as follows: "By a preponderance of the evidence is meant, not necessarily the greater number of witnesses, but a preponderance means that amount of the evidence which on the whole produces the stronger impression upon you and convinces you of *its* truth when weighed against the evidence in opposition thereto." The defendant does not criticize this instruction. Under these circumstances it appears that the jury would not have been misled as to the proof required. See Blackburn v. Martin & Mueller, 174 Okla. 394, 50 P. 2d 627.

Defendant further complains that the instruction was complete in itself and by unduly emphasizing the defendant's burden, it authorized a verdict only for the plaintiff and made it impossible for the jury to find for the defendant. Instruction No. 5 must be read in connection with instruction No. 4, which it amplifies. By instruction No. 4, the jury was told that if the defendant had proved by a preponderance of the evidence its defense of suicide, then the verdict was to be for the defendant. By instruction No. 5, the jury was told that the burden was on defendant to prove suicide and not on the plaintiff to disprove suicide, and that the jury should find for the plaintiff if defendant had failed to prove its defense. The instruction, in a sense, was repetitious of instruction No. 4, but was not prejudicially erroneous.

The judgment of the trial court is affirmed.

AFFIRMED.

PAINE, J., dissents.